CARTER *v.* CARTER COAL CO. ET AL.
HELVERING, COMMISSIONER OF INTERNAL
REVENUE, *v.* CARTER ET AL.

R. C. TWAY COAL CO. ET AL. *v.* GLENN, COLLEC-
TOR OF INTERNAL REVENUE.
R. C. TWAY COAL CO. ET AL. *v.* CLARK.

Nos. 636, 651, 649, and 650.   Argued March 11, 12, 1936.—Decided
May 18, 1936.

242

244

250

254

*Mr. Wood* and *Mr. William D. Whitney* filed a brief in behalf of Mr. Carter.

Oral argument, in part, of *Assistant Attorney General Dickinson* for respondents in Nos. 636 and 649 and for petitioner in No. 651:

264

*Solicitor General Reed, Assistant Attorney General Dickinson,* and *Messrs. Charles H. Weston, F. B. Critchlow, A. H. Feller, Charles Harwood,* and *Robert L. Stern* filed a brief in behalf of the government officers.

*Mr. Charles I. Dawson,* with whom *Mr. A. Shelby Winstead* was on the brief, for petitioners in Nos. 649 and 650.

274

*Mr. Karl J. Hardy* submitted for Carter Coal Co. et al., respondents in Nos. 636 and 651.

*Mr. Joseph Selligman* submitted for respondent in No. 650.

*Mr. Otto Kerner*, Attorney General of Illinois, and *Mr. Kent E. Keller*, on behalf of the State of Illinois; *Mr. Philip Lutz, Jr.*, Attorney General of Indiana, and *Mr. Urban C. Stover*, First Deputy Attorney General, on behalf of the State of Indiana; *Mr. A. E. Funk*, Assistant Attorney General of Kentucky, on behalf of the State of Kentucky; *Mr. Frank H. Patton*, Attorney General of New Mexico, on behalf of the State of New Mexico; *Mr. John Caren*, on behalf of the State of Ohio; *Mr. Charles J. Margiotti*, Attorney General of Pennsylvania, and *Messrs. Grover C. Ladner* and *Edward Friedman*, Deputy Attorneys General, on behalf of the Commonwealth of Pennsylvania; *Mr. G. W. Hamilton*, Attorney General of Washington, and *Messrs. Geo. G. Hannan* and *E. P. Donnelly*, Assistant Attorneys General, on behalf of the State of Washington; *Mr. Henry Warrum*, on behalf of

the United Mine Workers of America; and *Messrs. A. M. Liveright, Thurlow G. Essington, John L. Steinbugler,* and *C. F. C. Arensberg,* on behalf of members of the Bituminous Coal Code;—supporting the validity of the Act.

*Messrs. Rolla D. Campbell, John W. Davis, E. L. Greever, Don Rose, Robert S. Spilman, Edwin S. S. Sunderland, Malcolm Fooshee, Walter T. Kinder, Wm. E. Stevenson, Edward E. Barthell, Lee C. Bradley, Jr., Henry E. Colton, Wm. C. Cherry, George T. Evans, Matthew C. Fleming, Virgil Y. Moore, J. Van Dyke Norman, Percy Allen Rose,* and *Morris H. Winger,* on behalf of certain commercial producers of bituminous coal; and *Messrs. Forney Johnston* and *Jos. F. Johnston,* on behalf of certain producers of bituminous coal in the State of Alabama;—challenging the validity of the Act.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The purposes of the "Bituminous Coal Conservation Act of 1935," involved in these suits, as declared by the title, are to stabilize the bituminous coal-mining industry and promote its interstate commerce; to provide for co-operative marketing of bituminous coal; to levy a tax on such coal and provide for a drawback under certain conditions; to declare the production, distribution, and use of such coal to be affected with a national public interest; to conserve the national resources of such coal; to provide for the general welfare, and for other purposes. C. 824, 49 Stat. 991. The constitutional validity of the act is challenged in each of the suits.

Nos. 636 and 651 are cross-writs of certiorari in a stockholder's suit, brought in the Supreme Court of the District of Columbia by Carter against the Carter Coal Company and some of its officers, Guy T. Helvering (Commissioner of Internal Revenue of the United

States), and certain other officers of the United States, to enjoin the coal company and its officers named from filing an acceptance of the code provided for in said act, from paying any tax imposed upon the coal company under the authority of the act, and from complying with its provisions or the provisions of the code. The bill sought to enjoin the Commissioner of Internal Revenue and the other federal officials named from proceeding under the act in particulars specified, the details of which it is unnecessary to state.

No. 649 is a suit brought in a federal district court in Kentucky by petitioners against respondent collector of internal revenue for the district of Kentucky, to enjoin him from collecting or attempting to collect the taxes sought to be imposed upon them by the act, on the ground of its unconstitutionality.

No. 650 is a stockholder's suit brought in the same court against the coal company and some of its officers, to secure a mandatory injunction against their refusal to accept and operate under the provisions of the Bituminous Coal Code prepared in pursuance of the act.

By the terms of the act, every producer of bituminous coal within the United States is brought within its provisions.

Section 1 is a detailed assertion of circumstances thought to justify the act. It declares that the mining and distribution of bituminous coal throughout the United States by the producer are affected with a national public interest; and that the service of such coal in relation to industrial activities, transportation facilities, health and comfort of the people, conservation by controlled production and economical mining and marketing, maintenance of just and rational relations between the public, owners, producers and employees, the right of the public to constant and adequate supplies of coal at reasonable prices, and the general welfare of the nation,

require that the bituminous coal industry should be regulated as the act provides.

Section 1, among other things, further declares that the production and distribution by producers of such coal bear upon and directly affect interstate commerce, and render regulation of production and distribution imperative for the protection of such commerce; that certain features connected with the production, distribution, and marketing have led to waste of the national coal resources, disorganization of interstate commerce in such coal, and burdening and obstructing interstate commerce therein; that practices prevailing in the production of such coal directly affect interstate commerce and require regulation for the protection of that commerce; and that the right of mine workers to organize and collectively bargain for wages, hours of labor, and conditions of employment should be guaranteed in order to prevent constant wage cutting and disparate labor costs detrimental to fair interstate competition, and in order to avoid obstructions to interstate commerce that recur in industrial disputes over labor relations at the mines. These declarations constitute not enactments of law, but legislative averments by way of inducement to the enactment which follows.

The substantive legislation begins with § 2, which establishes in the Department of the Interior a National Bituminous Coal Commission, to be appointed and constituted as the section then specifically provides. Upon this commission is conferred the power to hear evidence and find facts upon which its orders and actions may be predicated.

Section 3 provides:

"There is hereby imposed upon the sale or other disposal of all bituminous coal produced within the United States an excise tax of 15 per centum on the sale price at the mine, or in the case of captive coal the fair market

value of such coal at the mine, such tax, subject to the later provisions of this section, to be payable to the United States by the producers of such coal, and to be payable monthly for each calendar month, on or before the first business day of the second succeeding month, and under such regulations, and in such manner, as shall be prescribed by the Commissioner of Internal Revenue: *Provided,* That in the case of captive coal produced as aforesaid, the Commissioner of Internal Revenue shall fix a price therefor at the current market price for the comparable kind, quality, and size of coals in the locality where the same is produced: *Provided further,* That any such coal producer who has filed with the National Bituminous Coal Commission his acceptance of the code provided for in section 4 of this Act, and who acts in compliance with the provisions of such code, shall be entitled to a drawback in the form of a credit upon the amount of such tax payable hereunder, equivalent to 90 per centum of the amount of such tax, to be allowed and deducted therefrom at the time settlement therefor is required, in such manner as shall be prescribed by the Commissioner of Internal Revenue. Such right or benefit of drawback shall apply to all coal sold or disposed of from and after the day of the producer's filing with the Commission his acceptance of said code in such form of agreement as the Commission may prescribe. No producer shall by reason of his acceptance of the code provided for in section 4 or of the drawback of taxes provided in section 3 of this Act be held to be precluded or estopped from contesting the constitutionality of any provision of said code, or its validity as applicable to such producer."

Section 4 provides that the commission shall formulate the elaborate provisions contained therein into a working agreement to be known as the Bituminous Coal Code. These provisions require the organization of twenty-three

coal districts, each with a district board the membership of which is to be determined in a manner pointed out by the act. Minimum prices for coal are to be established by each of these boards, which is authorized to make such classification of coals and price variation as to mines and consuming market areas as it may deem proper. "In order to sustain the stabilization of wages, working conditions, and maximum hours of labor, said prices shall be established so as to yield a return per net ton for each district in a minimum price area, as such districts are identified and such area is defined in the subjoined table designated 'Minimum-price area table,' equal as nearly as may be to the weighted average of the total costs, per net ton, determined as hereinafter provided, of the tonnage of such minimum price area. The computation of the total costs shall include the cost of labor, supplies, power, taxes, insurance, workmen's compensation, royalties, depreciation, and depletion (as determined by the Bureau of Internal Revenue in the computation of the Federal income tax) and all other direct expenses of production, coal operators' association dues, district board assessments for Board operating expenses only levied under the code, and reasonable costs of selling and the cost of administration." The district board must determine and adjust the total cost of the ascertainable tonnage produced in the district so as to give effect to any changes in wage rates, hours of employment, or other factors substantially affecting costs, which may have been established since January 1st, 1934.

Without repeating the long and involved provisions with regard to the fixing of minimum prices, it is enough to say that the act confers the power to fix the minimum price of coal at each and every coal mine in the United States, with such price variations as the board may deem necessary and proper. There is also a provision authorizing the commission, when deemed necessary in the public

interest, to establish maximum prices in order to protect the consumer against unreasonably high prices.

All sales and contracts for the sale of coal are subject to the code prices provided for and in effect when such sales and contracts are made. Various unfair methods of competition are defined and forbidden.

The labor provisions of the code, found in Part III of the same section, require that in order to effectuate the purposes of the act the district boards and code members shall accept specified conditions contained in the code, among which are the following:

Employees to be given the right to organize and bargain collectively, through representatives of their own choosing, free from interference, restraint, or coercion of employers or their agents in respect of their concerted activities.

Such employees to have the right of peaceable assemblage for the discussion of the principles of collective bargaining and to select their own check-weighman to inspect the weighing or measuring of coal.

A labor board is created, consisting of three members, to be appointed by the President and assigned to the Department of Labor. Upon this board is conferred authority to adjudicate disputes arising under the provisions just stated, and to determine whether or not an organization of employees had been promoted, or is controlled or dominated by an employer in its organization, management, policy, or election of representatives. The board "may order a code member to meet the representatives of its employees for the purpose of collective bargaining."

Subdivision (g) of Part III provides:

"Whenever the maximum daily and weekly hours of labor are agreed upon in any contract or contracts negotiated between the producers of more than two-thirds the annual national tonnage production for the

preceding calendar year and the representatives of more than one-half of the mine workers employed, such maximum hours of labor shall be accepted by all the code members. The wage agreement or agreements negotiated by collective bargaining in any district or group of two or more districts, between representatives of producers of more than two-thirds of the annual tonnage production of such district or each of such districts in a contracting group during the preceding calendar year, and representatives of the majority of the mine workers therein, shall be filed with the Labor Board and shall be accepted as the minimum wages for the various classifications of labor by the code members operating in such district or group of districts."

The bill of complaint in Nos. 636 and 651 was filed in the Supreme Court of the District of Columbia on August 31, 1935, the day after the Coal Conservation Act came into effect. That court, among other things, found that the suit was brought in good faith; that if Carter Coal Company should join the code it would be compelled to cancel existing contracts and pay its proportionate share of administering the code; that the production of bituminous coal is a local activity carried on within state borders; that coal is the nation's greatest and primary source of energy, vital to the public welfare, of the utmost importance to the industrial and economic life of the nation and the health and comfort of its inhabitants; and that its distribution in interstate commerce should be regular, continuous, and free of interruptions, obstructions, burdens, and restraints.

Other findings are to the effect that such coal is generally sold f. o. b. mine, and the predominant portion of it shipped outside the state in which it is produced; that the distribution and marketing is predominantly interstate in character, and that the intrastate distribution

and sale are so connected that interstate regulation cannot be accomplished effectively unless transactions of intrastate distribution and sale be regulated.

The court further found the existence of a condition of unrestrained and destructive competition in the system of distribution and marketing such coal, and of destructive price-cutting, burdening and restraining interstate commerce and dislocating and diverting its normal flow.

The court concluded as a matter of law that the bringing of the suit was not premature; that the plaintiff was without legal remedy, and rightly invoked relief in equity; that the labor provisions of the act and code were unconstitutional for reasons stated, but the price-fixing provisions were valid and constitutional; that the labor provisions are separable; and, since the provisions with respect to price-fixing and unfair competition are valid, the taxing provisions of the act could stand. Therefore, except for granting a permanent injunction against collection of the "taxes" accrued during the suit (*Ex parte Young*, 209 U. S. 123, 147–148), the court denied the relief sought, and dismissed the bill.

Appeals were taken to the United States Court of Appeals for the District of Columbia by the parties; but pending hearing and submission in that court, petitions for writs of certiorari were presented asking us to review the decree of the Supreme Court of the District without awaiting such hearing and submission. Because of the importance of the question and the advantage of a speedy final determination thereof, the writs were granted.

The remaining two suits (Nos. 649 and 650), involving the same questions, were brought in the federal District Court for the Western District of Kentucky. That court held the act valid and constitutional in its entirety and entered a decree accordingly. 12 F. Supp. 570. Appeals were taken to the Circuit Court of Appeals for the Sixth

Circuit; but, as in the Carter case and for the same reasons, this court granted writs of certiorari in advance of hearing and submission.

The questions involved will be considered under the following heads:

1. The right of stockholders to maintain suits of this character.

2. Whether the suits were prematurely brought.

3. Whether the exaction of 15 *per centum* on the sale price of coal at the mine is a tax or a penalty.

4. The purposes of the act as set forth in § 1, and the authority vested in Congress by the Constitution to effectuate them.

5. Whether the labor provisions of the act can be upheld as an exercise of the power to regulate interstate commerce.

6. Whether subdivision (g) of Part III of the Code, is an unlawful delegation of power.

7. The constitutionality of the price-fixing provisions, and the question of severability—that is to say, whether if either the group of labor provisions or the group of price-fixing provisions be found constitutionally invalid, the other can stand as separable.

*First.* In the Carter case (Nos. 636 and 651) the stockholder who brought the suit had formally demanded of the board of directors that the company should not join the code, should refuse to pay the tax fixed by the act, and should bring appropriate judicial proceedings to prevent an unconstitutional and improper diversion of the assets of the company and to have determined the liability of the company under the act. The board considered the demand, determined that, while it believed the act to be unconstitutional and economically unsound and that it would adversely affect the business of the company if accepted, nevertheless it should accept the code provided for by the act because the penalty in the form

of a 15% tax on its gross sales would be seriously injurious and might result in bankruptcy. This action of the board was approved by a majority of the shareholders at a special meeting called for the purpose of considering it.

In the Tway Company cases, the company itself brought suit to enjoin the enforcement of the act (No. 649); and a stockholder brought suit to compel the company to accept the code and operate under its provisions (No. 650).

Without repeating the long averments of the several bills, we are of opinion that the suits were properly brought and were maintainable in a court of equity. The right of stockholders to bring such suits under the circumstances disclosed is settled by the recent decision of this court in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, and requires no further discussion.

*Second.* That the suits were not prematurely brought also is clear. Section 2 of the act is mandatory in its requirement that the commission be appointed by the President. The provisions of § 4 that the code be formulated and promulgated are equally mandatory. The so-called tax of 15% is definitely imposed, and its exaction certain to ensue.

In *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 592–595, suits were brought by Pennsylvania and Ohio against West Virginia to enjoin the defendant state from enforcing an act of her legislature upon the ground that it would injuriously affect or cut off the supply of natural gas produced in her territory and carried by pipe lines into the territory of the plaintiff states and there sold and used. These suits were brought a few days after the West Virginia act became effective. No order had yet been made under it by the Public Service Commission, nor had it been tested in actual practice. But it appeared that the act was certain to operate as the complainant

states apprehended it would. This court held that the suit was not premature. "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough."

*Pierce* v. *Society of Sisters,* 268 U. S. 510, 535–536, involved the constitutional validity of the Oregon Compulsory Education Act, which required every parent or other person having control of a child between the ages of eight and sixteen years to send him to the public school of the district where he resides. Suit was brought to enjoin the operation of the act by corporations owning and conducting private schools, on the ground that their business and property were threatened with destruction through the unconstitutional compulsion exercised by the act upon parents and guardians. The suits were held to be not premature, although the effective date of the act had not yet arrived. We said—"The injury to appellees was present and very real, not a mere possibility in the remote future. If no relief had been possible prior to the effective date of the Act, the injury would have become irreparable. Prevention of impending injury by unlawful action is a well recognized function of courts of equity."

See, also, *Terrace* v. *Thompson,* 263 U. S. 197, 215–216; *Swift & Co.* v. *United States,* 276 U. S. 311, 326; *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 386; *City Bank Co.* v. *Schnader,* 291 U. S. 24, 34.

*Third.* The so-called excise tax of 15 *per centum* on the sale price of coal at the mine, or, in the case of captive coal the fair market value, with its drawback allowance of 13½%, is clearly not a tax but a penalty. The exaction applies to all bituminous coal produced, whether it be sold, transported or consumed in interstate commerce, or transactions in respect of it be confined wholly

to the limits of the state. It also applies to "captive coal"—that is to say, coal produced for the sole use of the producer.

It is very clear that the "excise tax" is not imposed for revenue but exacted as a penalty to compel compliance with the regulatory provisions of the act. The whole purpose of the exaction is to coerce what is called an agreement—which, of course, it is not, for it lacks the essential element of consent. One who does a thing in order to avoid a monetary penalty does not agree; he yields to compulsion precisely the same as though he did so to avoid a term in jail.

The exaction here is a penalty and not a tax within the test laid down by this court in numerous cases. *Child Labor Tax Case*, 259 U. S. 20, 37–39; *United States* v. *La Franca*, 282 U. S. 568, 572; *United States* v. *Constantine*, 296 U. S. 287, 293 *et seq.*; *United States* v. *Butler*, 297 U. S. 1, 70. While the lawmaker is entirely free to ignore the ordinary meanings of words and make definitions of his own, *Karnuth* v. *United States*, 279 U. S. 231, 242; *Tyler* v. *United States*, 281 U. S. 497, 502, that device may not be employed so as to change the nature of the acts or things to which the words are applied. But it is not necessary to pursue the matter further. That the "tax" is in fact a penalty is not seriously in dispute. The position of the Government, as we understand it, is that the validity of the exaction does not rest upon the taxing power but upon the power of Congress to regulate interstate commerce; and that if the act in respect of the labor and price-fixing provisions be not upheld, the "tax" must fall with them. With that position we agree and confine our consideration accordingly.

*Fourth.* Certain recitals contained in the act plainly suggest that its makers were of opinion that its constitutionality could be sustained under some general federal

power, thought to exist, apart from the specific grants of the Constitution. The fallacy of that view will be apparent when we recall fundamental principles which, although hitherto often expressed in varying forms of words, will bear repetition whenever their accuracy seems to be challenged. The recitals to which we refer are contained in § 1 (which is simply a preamble to the act), and, among others, are to the effect that the distribution of bituminous coal is of national interest, affecting the health and comfort of the people and the general welfare of the nation; that this circumstance, together with the necessity of maintaining just and rational relations between the public, owners, producers, and employees, and the right of the public to constant and adequate supplies at reasonable prices, require regulation of the industry as the act provides. These affirmations—and the further ones that the production and distribution of such coal "directly affect interstate commerce," because of which and of the waste of the national coal resources and other circumstances, the regulation is necessary for the protection of such commerce—do not constitute an exertion of the *will* of Congress which is legislation, but a recital of considerations which in the *opinion* of that body existed and justified the expression of its will in the present act. Nevertheless, this preamble may not be disregarded. On the contrary it is important, because it makes clear, except for the pure assumption that the conditions described "directly" affect interstate commerce, that the powers which Congress undertook to exercise are not specific but of the most general character—namely, to protect the general public interest and the health and comfort of the people, to conserve privately-owned coal, maintain just relations between producers and employees and others, and promote the general welfare, by controlling nation-wide production and distribution of coal. These, it may be conceded, are objects of great worth;

but are they ends, the attainment of which has been committed by the Constitution to the federal government? This is a vital question; for nothing is more certain than that beneficent aims, however great or well directed, can never serve in lieu of constitutional power.

The ruling and firmly established principle is that the powers which the general government may exercise are only those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers. Whether the end sought to be attained by an act of Congress is legitimate is wholly a matter of constitutional power and not at all of legislative discretion. Legislative congressional discretion begins with the choice of means and ends with the adoption of methods and details to carry the delegated powers into effect. The distinction between these two things—power and discretion—is not only very plain but very important. For while the powers are rigidly limited to the enumerations of the Constitution, the means which may be employed to carry the powers into effect are not restricted, save that they must be appropriate, plainly adapted to the end, and not prohibited by, but consistent with, the letter and spirit of the Constitution. *McCulloch* v. *Maryland*, 4 Wheat. 316, 421. Thus, it may be said that to a constitutional end many ways are open; but to an end not within the terms of the Constitution, all ways are closed.

The proposition, often advanced and as often discredited, that the power of the federal government inherently extends to purposes affecting the nation as a whole with which the states severally cannot deal or cannot adequately deal, and the related notion that Congress, entirely apart from those powers delegated by the Constitution, may enact laws to promote the general welfare, have never been accepted but always definitely rejected by this court. Mr. Justice Story, as early as 1816,

laid down the cardinal rule, which has ever since been followed—that the general government "can claim no powers which are not granted to it by the Constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication." *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326. In the Framers Convention, the proposal to confer a general power akin to that just discussed was included in Mr. Randolph's resolutions, the sixth of which, among other things, declared that the National Legislature ought to enjoy the legislative rights vested in Congress by the Confederation, and "moreover to legislate in all cases to which the separate States are incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual Legislation." The convention, however, declined to confer upon Congress power in such general terms; instead of which it carefully limited the powers which it thought wise to entrust to Congress by specifying them, thereby denying all others not granted expressly or by necessary implication. It made no grant of authority to Congress to legislate substantively for the general welfare, *United States* v. *Butler,. supra,* p. 64; and no such authority exists, save as the general welfare may be promoted by the exercise of the powers which are granted. Compare *Jacobson* v. *Massachusetts,* 197 U. S. 11, 22.

There are many subjects in respect of which the several states have not legislated in harmony with one another, and in which their varying laws and the failure of some of them to act at all have resulted in injurious confusion and embarrassment. See *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 232–233. The state laws with respect to marriage and divorce present a case in point; and the great necessity of national legislation on that subject has been from time to time vigorously urged. Other pertinent examples are laws with respect to nego-

tiable instruments, desertion and non-support, certain phases of state taxation, and others which we do not pause to mention. In many of these fields of legislation, the necessity of bringing the applicable rules of law into general harmonious relation has been so great that a Commission on Uniform State Laws, composed of commissioners from every state in the Union, has for many years been industriously and successfully working to that end by preparing and securing the passage by the several states of uniform laws. If there be an easier and constitutional way to these desirable results through congressional action, it thus far has escaped discovery.

Replying directly to the suggestion advanced by counsel in *Kansas* v. *Colorado*, 206 U. S. 46, 89–90, to the effect that necessary powers national in their scope must be found vested in Congress, though not expressly granted or essentially implied, this court said:

"But the proposition that there are legislative powers affecting the Nation as a whole which belong to, although not expressed in the grant of powers, is in direct conflict with the doctrine that this is a government of enumerated powers. That this is such a government clearly appears from the Constitution, independently of the Amendments, for otherwise there would be an instrument granting certain specified things made operative to grant other and distinct things. This natural construction of the original body of the Constitution is made absolutely certain by the Tenth Amendment. This amendment, which was seemingly adopted with prescience of just such contention as the present, disclosed the widespread fear that the National Government might, under the pressure of a supposed general welfare, attempt to exercise powers which had not been granted. With equal determination the framers intended that no such assumption should ever find justification in the organic act, and that if in the future further powers seemed necessary they should

be granted by the people in the manner they had provided for amending that act."

The general rule with regard to the respective powers of the national and the state governments under the Constitution, is not in doubt. The states were before the Constitution; and, consequently, their legislative powers antedated the Constitution. Those who framed and those who adopted that instrument meant to carve from the general mass of legislative powers, then possessed by the states, only such portions as it was thought wise to confer upon the federal government; and in order that there should· be no uncertainty in respect of what was taken and what was left, the national powers of legislation were not aggregated but enumerated—with the result that what was not embraced by the enumeration remained vested in the states without change or impairment. Thus, "when it was found necessary to establish a national government for national purposes," this court said in *Munn* v. *Illinois*, 94 U. S. 113, 124, "a part of the powers of the States and of the people of the States was granted to the United States and the people of the United States. This grant operated as a further limitation upon the powers of the States, so that now the governments of the States possess all the powers of the Parliament of England, except such as have been delegated to the United States or reserved by the people." While the states are not sovereign in the true sense of that term, but only *quasi*-sovereign, yet in respect of all powers reserved to them they are supreme—"as independent of the general government as that government within its sphere is independent of the States." *Collector* v. *Day*, 11 Wall. 113, 124. And since every addition to the national legislative power to some extent detracts from or invades the power of the states, it is of vital moment that, in order to preserve the fixed balance intended by the Constitution, the powers of the general government

be not so extended as to embrace any not within the express terms of the several grants or the implications necessarily to be drawn therefrom. It is no longer open to question that the general government, unlike the states, *Hammer* v. *Dagenhart,* 247 U. S. 251, 275, possesses no *inherent* power in respect of the internal affairs of the states; and emphatically not with regard to legislation. The question in respect of the inherent power of that government as to the external affairs of the nation and in the field of international law is a wholly different matter which it is not necessary now to consider. See, however, *Jones* v. *United States,* 137 U. S. 202, 212; *Nishimura Ekiu* v. *United States,* 142 U. S. 651, 659; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 705 *et seq.; Burnet* v. *Brooks,* 288 U. S. 378, 396.

The determination of the Framers Convention and the ratifying conventions to preserve complete and unimpaired state self-government in all matters not committed to the general government is one of the plainest facts which emerge from the history of their deliberations. And adherence to that determination is incumbent equally upon the federal government and the states. State powers can neither be appropriated on the one hand nor abdicated on the other. As this court said in *Texas* v. *White,* 7 Wall. 700, 725—"the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." Every journey to a forbidden end begins with the first step; and the danger of such a step by the federal government in the direction of taking over the powers of the states is that the end of the journey may find the states so despoiled of their powers, or—what may amount to the same thing—so

relieved of the responsibilities which possession of the powers necessarily enjoins, as to reduce them to little more than geographical subdivisions of the national domain. It is safe to say that if, when the Constitution was under consideration, it had been thought that any such danger lurked behind its plain words, it would never have been ratified.

And the Constitution itself is in every real sense a law—the lawmakers being the people themselves, in whom under our system all political power and sovereignty primarily resides, and through whom such power and sovereignty primarily speaks. It is by that law, and not otherwise, that the legislative, executive, and judicial agencies which it created exercise such political authority as they have been permitted to possess. The Constitution speaks for itself in terms so plain that to misunderstand their import is not rationally possible. "We the people of the United States," it says, "do ordain and establish this Constitution . . ." Ordain and establish! These are definite words of enactment, and without more would stamp what follows with the dignity and character of law. The framers of the Constitution, however, were not content to let the matter rest here, but provided explicitly—"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; . . ." The supremacy of the Constitution as law is thus declared without qualification. That supremacy is absolute; the supremacy of a statute enacted by Congress is not absolute but conditioned upon its being made in pursuance of the Constitution. And a judicial tribunal, clothed by that instrument with complete judicial power, and, therefore, by the very nature of the power, required to ascertain and apply the law to the facts in every case or proceeding properly brought for adjudication, must apply the supreme law and reject the inferior stat-

ute whenever the two conflict. In the discharge of that duty, the opinion of the lawmakers that a statute passed by them is valid must be given great weight, *Adkins* v. *Children's Hospital,* 261 U. S. 525, 544; but their opinion, or the court's opinion, that the statute will prove greatly or generally beneficial is wholly irrelevant to the inquiry. *Schechter* v. *United States,* 295 U. S. 495, 549–550.

We have set forth, perhaps at unnecessary length, the foregoing principles, because it seemed necessary to do so in order to demonstrate that the general purposes which the act recites, and which, therefore, unless the recitals be disregarded, Congress undertook to achieve, are beyond the power of Congress except so far, and only so far, as they may be realized by an exercise of some specific power granted by the Constitution. Proceeding by a process of elimination, which it is not necessary to follow in detail, we shall find no grant of power which authorizes Congress to legislate in respect of these general purposes unless it be found in the commerce clause—and this we now consider.

*Fifth.* Since the validity of the act depends upon whether it is a regulation of interstate commerce, the nature and extent of the power conferred upon Congress by the commerce clause becomes the determinative question in this branch of the case. The commerce clause vests in Congress the power—"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The function to be exercised is that of regulation. The thing to be regulated is the commerce described. In exercising the authority conferred by this clause of the Constitution, Congress is powerless to regulate anything which is not commerce, as it is powerless to do anything about commerce which is not regulation. We first inquire, then—What is commerce? The term, as this court many times has said, is

one of extensive import. No all-embracing definition has ever been formulated. The question is to be approached both affirmatively and negatively—that is to say, from the points of view as to what it includes and what it excludes.

In *Gibbons* v. *Ogden,* 9 Wheat. 1, 189–190, Chief Justice Marshall said:

"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. . . ."

As used in the Constitution, the word "commerce" is the equivalent of the phrase "intercourse for the purposes of trade," and includes transportation, purchase, sale, and exchange of commodities between the citizens of the different states. And the power to regulate commerce embraces the instruments by which commerce is carried on. *Welton* v. *Missouri,* 91 U. S. 275, 280; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 241; *Hopkins* v. *United States,* 171 U. S. 578, 597. In *Adair* v. *United States,* 208 U. S. 161, 177, the phrase "Commerce among the several States" was defined as comprehending "traffic, intercourse, trade, navigation, communication, the transit of persons and the transmission of messages by telegraph—indeed, every species of commercial intercourse among the several States." In *Veazie* v. *Moor,* 14 How. 568, 573–574, this court, after saying that the phrase could never be applied to transactions wholly internal, significantly added: "Nor can it be properly concluded, that, because the products of domestic enterprise in agriculture or manufactures, or in the arts, may ultimately become the subjects of foreign commerce, that the control of the means or the encouragements by which enterprise is fostered and protected, is legitimately within the import of the phrase *foreign commerce,* or fairly im-

plied in any investiture of the power to regulate such commerce. A pretension as far reaching as this, would extend to contracts between citizen and citizen of the same State, would control the pursuits of the planter, the grazier, the manufacturer, the mechanic, the immense operations of the collieries and mines and furnaces of the country; for there is not one of these avocations, the results of which may not become the subjects of foreign commerce, and be borne either by turnpikes, canals, or railroads, from point to point within the several States, towards an ultimate destination, like the one above mentioned. . . ."

The distinction between manufacture and commerce was discussed in *Kidd* v. *Pearson*, 128 U. S. 1, 20, 21, 22; and it was said:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. . . . If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining—in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest and the cotton planter of the South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and

denied to the States, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform and vital interests—interests which in their nature are and must be local in all the details of their successful management."

And then, as though foreseeing the present controversy, the opinion proceeds:

"Any movement toward the establishment of rules of production in this vast country, with its many different climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement toward the local, detailed and incongruous legislation required by such interpretation would be about the widest possible departure from the declared object of the clause in question. Nor this alone. Even in the exercise of the power contended for, Congress would be confined to the regulation, not of certain branches of industry, however numerous, but to those instances in each and every branch where the producer contemplated an interstate market. . . . A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the States, and less likely to have been what the framers of the Constitution intended, it would be difficult to imagine."

Chief Justice Fuller, speaking for this court in *United States* v. *E. C. Knight Co.*, 156 U. S. 1, 12, 13, said:

"Doubtless the power to control the manufacture of a given thing involves in a certain sense the control of its disposition, but this is a secondary and not the primary sense; and although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. . . .

"It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed, for while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the States as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne, than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality.

". . . The regulation of commerce applies to the subjects of commerce and not to matters of internal police. Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purposes of such transit among the States, or put in the way of transit, may be regulated, but this is because they form part of interstate trade or commerce. The fact that an article is manufactured for export to another State does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the State and belongs to commerce. . . ."

That commodities produced or manufactured within a state are intended to be sold or transported outside the state does not render their production or manufacture subject to federal regulation under the commerce clause. As this court said in *Coe* v. *Errol,* 116 U. S. 517, 526, "Though intended for exportation, they may never be exported; the owner has a perfect right to change his mind; and until actually put in motion, for some place out of the State, or committed to the custody of a carrier for transportation to such place, why may they not be regarded as still remaining a part of the general mass of

property in the State?" It is true that this was said in respect of a challenged power of the state to impose a tax; but the query is equally pertinent where the question, as here, is with regard to the power of regulation. The case was relied upon in *Kidd* v. *Pearson, supra,* p. 26. "The application of the principles above announced," it was there said, "to the case under consideration leads to a conclusion against the contention of the plaintiff in error. The police power of a State is as broad and plenary as its taxing power; and property within the State is subject to the operations of the former so long as it is within the regulating restrictions of the latter."

In *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, 259–260, we held that the possibility, or even certainty of exportation of a product or article from a state did not determine it to be in interstate commerce before the commencement of its movement from the state. To hold otherwise "would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other States, at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined, because they are in varying percentages destined for and surely to be exported to States other than those of their production."

In *Oliver Iron Co.* v. *Lord,* 262 U. S. 172, 178, we said on the authority of numerous cited cases: "Mining is not interstate commerce, but, like manufacturing, is a local business subject to local regulation and taxation. ... Its character in this regard is intrinsic, is not affected by the intended use or disposal of the product, is not controlled by contractual engagements, and persists even

though the business be conducted in close connection with interstate commerce."

The same rule applies to the production of oil. "Such production is essentially a mining operation and therefore is not a part of interstate commerce even though the product obtained is intended to be and in fact is immediately shipped in such commerce." *Champlin Rfg. Co.* v. *Corporation Commission,* 286 U. S. 210, 235. One who produces or manufactures a commodity, subsequently sold and shipped by him in interstate commerce, whether such sale and shipment were originally intended or not, has engaged in two distinct and separate activities. So far as he produces or manufactures a commodity, his business is purely local. So far as he sells and ships, or contracts to sell and ship, the commodity to customers in another state, he engages in interstate commerce. In respect of the former, he is subject only to regulation by the state; in respect of the latter, to regulation only by the federal government. *Utah Power & L. Co.* v. *Pfost,* 286 U. S. 165, 182. Production is not commerce; but a step in preparation for commerce. *Chassaniol* v. *Greenwood,* 291 U. S. 584, 587.

We have seen that the word "commerce" is the equivalent of the phrase "intercourse for the purposes of trade." Plainly, the incidents leading up to and culminating in the mining of coal do not constitute such intercourse. The employment of men, the fixing of their wages, hours of labor and working conditions, the bargaining in respect of these things—whether carried on separately or collectively—each and all constitute intercourse for the purposes of production, not of trade. The latter is a thing apart from the relation of employer and employee, which in all producing occupations is purely local in character. Extraction of coal from the mine is the aim and the completed result of local activities. Commerce in the coal mined is not brought into being by

force of these activities, but by negotiations, agreements, and circumstances entirely apart from production. Mining brings the subject matter of commerce into existence. Commerce disposes of it.

A consideration of the foregoing, and of many cases which might be added to those already cited, renders inescapable the conclusion that the effect of the labor provisions of the act, including those in respect of minimum wages, wage agreements, collective bargaining, and the Labor Board and its powers, primarily falls upon production and not upon commerce; and confirms the further resulting conclusion that production is a purely local activity. It follows that none of these essential antecedents of production constitutes a transaction in or forms any part of interstate commerce. *Schechter Corp.* v. *United States, supra,* p. 542 *et seq.* Everything which moves in interstate commerce has had a local origin. Without local production somewhere, interstate commerce, as now carried on, would practically disappear. Nevertheless, the local character of mining, of manufacturing and of crop growing is a fact, and remains a fact, whatever may be done with the products.

Certain decisions of this court, superficially considered, seem to lend support to the defense of the act now under review. But upon examination, they will be seen to be inapposite. Thus, *Coronado Coal Co.* v. *United Mine Workers,* 268 U. S. 295, 310, and kindred cases, involved conspiracies to restrain interstate commerce in violation of the Anti-trust laws. The acts of the persons involved were local in character, but the intent was to restrain interstate commerce, and the means employed were calculated to carry that intent into effect. Interstate commerce was the direct object of attack; and the restraint of such commerce was the necessary consequence of the acts and the immediate end in view. *Bedford Stone Co.*

v. *Stone Cutters Assn.*, 274 U. S. 37, 46. The applicable law was concerned not with the character of the acts or of the means employed, which might be in and of themselves purely local, but with the intent and direct operation of those acts and means upon interstate commerce. "The mere reduction in the supply of an article," this court said in the *Coronado Co.* case, *supra,* p. 310, "to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act."

Another group of cases, of which *Swift & Co.* v. *United States,* 196 U. S. 375, is an example, rest upon the circumstance that the acts in question constituted direct interferences with the "flow" of commerce among the states. In the *Swift* case, livestock was consigned and delivered to stockyards—not as a place of final destination, but, as the court said in *Stafford* v. *Wallace,* 258 U. S. 495, 516, "a throat through which the current flows." The sales which ensued merely changed the private interest in the subject of the current without interfering with its continuity. *Industrial Assn.* v. *United States,* 268 U. S. 64, 79. It was nowhere suggested in these cases that the interstate commerce power extended to the growth or production of the things which, after production, entered the flow. If the court had held that the raising of the cattle, which were involved in the *Swift* case, including the wages paid to and working conditions of the herders and others employed in the business, could be regulated by Congress, that decision and decisions holding similarly would be in

point; for it is that situation, and not the one with which the court actually dealt, which here concerns us.

The distinction suggested is illustrated by the decision in *Arkadelphia Milling Co.* v. *St. Louis S. W. Ry. Co.,* 249 U. S. 134, 150–152. That case dealt with orders of a state commission fixing railroad rates. One of the questions considered was whether certain shipments of rough material from the forest to mills in the same state for manufacture, followed by the forwarding of the finished product to points outside the state, was a continuous movement in interstate commerce. It appeared that when the rough material reached the mills it was manufactured into various articles which were stacked or placed in kilns to dry, the processes occupying several months. Markets for the manufactured articles were almost entirely in other states or in foreign countries. About 95% of the finished articles was made for outbound shipment. When the rough material was shipped to the mills, it was expected by the mills that this percentage of the finished articles would be so sold and shipped outside the state. And all of them knew and intended that this 95% of the finished product would be so sold and shipped. This court held that the state order did not interfere with interstate commerce, and that the *Swift* case was not in point; as it is not in point here.

The restricted field covered by the *Swift* and kindred cases is illustrated by the *Schechter* case, *supra,* p. 543. There the commodity in question, although shipped from another state, had come to rest in the state of its destination, and, as the court pointed out, was no longer in a current or flow of interstate commerce. The *Swift* doctrine was rejected as inapposite. In the *Schechter* case the flow had ceased. Here it had not begun. The difference is not one of substance. The applicable principle is the same.

But § 1 (the preamble) of the act now under review declares that all production and distribution of bituminous coal "bear upon and directly affect its interstate commerce"; and that regulation thereof is imperative for the protection of such commerce. The contention of the government is that the labor provisions of the act may be sustained in that view.

That the production of every commodity intended for interstate sale and transportation has some effect upon interstate commerce may be, if it has not already been, freely granted; and we are brought to the final and decisive inquiry, whether here that effect is direct, as the "preamble" recites, or indirect. The distinction is not formal, but substantial in the highest degree, as we pointed out in the *Schechter* case, *supra,* p. 546, *et seq.* "If the commerce clause were construed," we there said, "to reach all enterprises and transactions which could be said to have an indirect effect upon interstate commerce, the federal authority would embrace practically all the activities of the people and the authority of the State over its domestic concerns would exist only by sufferance of the federal government. Indeed, on such a theory, even the development of the State's commercial facilities would be subject to federal control." It was also pointed out, p. 548, that "the distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one, essential to the maintenance of our constitutional system."

Whether the effect of a given activity or condition is direct or indirect is not always easy to determine. The word "direct" implies that the activity or condition invoked or blamed shall operate proximately—not mediately, remotely, or collaterally—to produce the effect. It connotes the absence of an efficient intervening agency

or condition. And the extent of the effect bears no logical relation to its character. The distinction between a direct and an indirect effect turns, not upon the magnitude of either the cause or the effect, but entirely upon the manner in which the effect has been brought about. If the production by one man of a single ton of coal intended for interstate sale and shipment, and actually so sold and shipped, affects interstate commerce indirectly, the effect does not become direct by multiplying the tonnage, or increasing the number of men employed, or adding to the expense or complexities of the business, or by all combined. It is quite true that rules of law are sometimes qualified by considerations of degree, as the government argues. But the matter of degree has no bearing upon the question here, since that question is not—What is the *extent* of the local activity or condition, or the *extent* of the effect produced upon interstate commerce? but—What is the *relation* between the activity or condition and the effect?

Much stress is put upon the evils which come from the struggle between employers and employees over the matter of wages, working conditions, the right of collective bargaining, etc., and the resulting strikes, curtailment and irregularity of production and effect on prices; and it is insisted that interstate commerce is *greatly* affected thereby. But, in addition to what has just been said, the conclusive answer is that the evils are all local evils over which the federal government has no legislative control. The relation of employer and employee is a local relation. At common law, it is one of the domestic relations. The wages are paid for the doing of local work. Working conditions are obviously local conditions. The employees are not engaged in or about commerce, but exclusively in producing a commodity. And the controversies and evils, which it is the object of the

act to regulate and minimize, are local controversies and evils affecting local work undertaken to accomplish that local result. Such effect as they may have upon commerce, however extensive it may be, is secondary and indirect. An increase in the greatness of the effect adds to its importance. It does not alter its character.

The government's contentions in defense of the labor provisions are really disposed of adversely by our decision in the *Schechter* case, *supra.* The only perceptible difference between that case and this is that in the *Schechter* case the federal power was asserted with respect to commodities which had come to rest after their interstate transportation; while here, the case deals with commodities at rest before interstate commerce has begun. That difference is without significance. The federal regulatory power ceases when interstate commercial intercourse ends; and, correlatively, the power does not attach until interstate commercial intercourse begins. There is no basis in law or reason for applying different rules to the two situations. No such distinction can be found in anything said in the *Schechter* case. On the contrary, the situations were recognized as akin. In the opinion, at page 546, after calling attention to the fact that if the commerce clause could be construed to reach transactions having an indirect effect upon interstate commerce the federal authority would embrace practically all the activities of the people, and the authority of the state over its domestic concerns would exist only by sufferance of the federal government, we said: "Indeed, on such a theory, even the development of the State's commercial facilities would be subject to federal control." And again, after pointing out that hours and wages have no direct relation to interstate commerce and that if the federal government had power to determine the wages and hours of employees in the internal commerce of a state because of their relation to cost and prices and their

indirect effect upon interstate commerce, we said, p. 549: "All the processes of production and distribution that enter into cost could likewise be controlled. If the cost of doing an intrastate business is in itself the permitted object of federal control, the extent of the regulation of cost would be a question of discretion and not of power." A reading of the entire opinion makes clear, what we now declare, that the want of power on the part of the federal government is the same whether the wages, hours of service, and working conditions, and the bargaining about them, are related to production before interstate commerce has begun, or to sale and distribution after it has ended.

*Sixth.* That the act, whatever it may be in form, in fact is compulsory clearly appears. We have already discussed § 3, which imposes the excise tax as a penalty to compel "acceptance" of the code. Section 14 provides that the United States shall purchase no bituminous coal produced at any mine where the producer has not complied with the provisions of the code; and that each contract made by the United States shall contain a provision that the contractor will buy no bituminous coal to use on, or in the carrying out of, such contract unless the producer be a member of the code, as certified by the coal commission. In the light of these provisions we come to a consideration of subdivision (g) of Part III of § 4, dealing with "Labor Relations."

That subdivision delegates the power to fix maximum hours of labor to a part of the producers and the miners— namely, "the producers of more than two-thirds of the annual national tonnage production for the preceding calendar year" and "more than one-half of the mine workers employed"; and to producers of more than two-thirds of the district annual tonnage during the preceding calendar year and a majority of the miners, there is delegated the power to fix minimum wages for the district

or group of districts. The effect, in respect of wages and hours, is to subject the dissentient minority, either of producers or miners or both, to the will of the stated majority, since, by refusing to submit, the minority at once incurs the hazard of enforcement of the drastic compulsory provisions of the act to which we have referred. To "accept," in these circumstances, is not to exercise a choice, but to surrender to force.

The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business. The record shows that the conditions of competition differ among the various localities. In some, coal dealers compete among themselves. In other localities, they also compete with the mechanical production of electrical energy and of natural gas. Some coal producers favor the code; others oppose it; and the record clearly indicates that this diversity of view arises from their conflicting and even antagonistic interests. The difference between producing coal and regulating its production is, of course, fundamental. The former is a private activity; the latter is necessarily a governmental function, since, in the very nature of things, one person may not be entrusted with the power to regulate the business of another, and especially of a competitor. And a statute which attempts to confer such power undertakes an intolerable and unconstitutional interference with personal liberty and private property. The delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question. *Schechter Corp.* v. *United States,*

295 U. S. at p. 537; *Eubank* v. *Richmond*, 226 U. S. 137, 143; *Seattle Trust Co.* v. *Roberge*, 278 U. S. 116, 121–122.

*Seventh.* Finally, we are brought to the price-fixing provisions of the code. The necessity of considering the question of their constitutionality will depend upon whether they are separable from the labor provisions so that they can stand independently. Section 15 of the act provides:

"If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act and the application of such provisions to other persons or circumstances shall not be affected thereby."

In the absence of such a provision, the presumption is that the legislature intends an act to be effective as an entirety—that is to say, the rule is against the mutilation of a statute; and if any provision be unconstitutional, the presumption is that the remaining provisions fall with it. The effect of the statute is to reverse this presumption in favor of inseparability and create the opposite one of separability. Under the non-statutory rule, the burden is upon the supporter of the legislation to show the separability of the provisions involved. Under the statutory rule, the burden is shifted to the assailant to show their inseparability. But under either rule, the determination, in the end, is reached by applying the same test—namely, What was the intent of the lawmakers?

Under the statutory rule, the presumption must be overcome by considerations which establish "the clear probability that the invalid part being eliminated the legislature would not have been satisfied with what remains," *Williams* v. *Standard Oil Co.*, 278 U. S. 235, 241 *et seq.;* or, as stated in *Utah Power & L. Co.* v. *Pfost*, 286 U. S. 165, 184–185, "the clear probability that the legislature would not have been satisfied with the statute un-

less it had included the invalid part." Whether the provisions of a statute are so interwoven that one being held invalid the other must fall, presents a question of statutory construction and of legislative intent, to the determination of which the statutory provision becomes an aid. "But it is an aid merely; not an inexorable command." *Dorchy* v. *Kansas,* 264 U. S. 286, 290. The presumption in favor of separability does not authorize the court to give the statute "an effect altogether different from that sought by the measure viewed as a whole." *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330, 362.

The statutory aid to construction in no way alters the rule that in order to hold one part of a statute unconstitutional and uphold another part as separable, they must not be mutually dependent upon one another. Perhaps a fair approach to a solution of the problem is to suppose that while the bill was pending in Congress a motion to strike out the labor provisions had prevailed, and to inquire whether, in that event, the statute should be so construed as to justify the conclusion that Congress, notwithstanding, probably would not have passed the price-fixing provisions of the code.

Section 3 of the act, which provides that no producer shall, by accepting the code or the drawback of taxes, be estopped from contesting the constitutionality of any provision of the code, is thought to aid the separability clause. But the effect of that provision is simply to permit the producer to challenge any provision of the code despite his acceptance of the code or the drawback. It seems not to have anything to do with the question of separability.

With the foregoing principles in mind, let us examine the act itself. The title of the act and the preamble demonstrate, as we have already seen, that Congress desired to accomplish certain general purposes therein recited. To that end it created a commission, with man-

datory directions to formulate into a working agreement the provisions set forth in § 4 of the act. That being done, the result is a code. Producers accepting and operating under the code are to be known as code members; and § 4 specifically requires that, in order to carry out the policy of the act, "the code shall contain the following conditions, provisions, and obligations . . ." which are then set forth. No power is vested in the commission, in formulating the code, to omit any of these conditions, provisions, or obligations. The mandate to include them embraces all of them. Following the requirement just quoted, and, significantly, *in the same section* (*International Textbook Co.* v. *Pigg*, 217 U. S. 91, 112–113) under appropriate headings, the price-fixing and labor-regulating provisions are set out in great detail. These provisions, plainly meant to operate together and not separately, constitute the means designated to bring about the stabilization of bituminous-coal production, and thereby to regulate or affect interstate commerce in such coal. The first clause of the title is: "To stabilize the bituminous coal-mining industry and promote its interstate commerce."

Thus, the primary contemplation of the act is stabilization of the industry through the regulation of labor *and* the regulation of prices; for, since both were adopted, we must conclude that both were thought essential. The regulations of labor on the one hand and prices on the other furnish mutual aid and support; and their associated force—not one or the other but both combined—was deemed by Congress to be necessary to achieve the end sought. The statutory mandate for a code upheld by two legs at once suggests the improbability that Congress would have assented to a code supported by only one.

This seems plain enough; for Congress must have been conscious of the fact that elimination of the labor provi-

sions from the act would seriously impair, if not destroy, the force and usefulness of the price provisions. The interdependence of wages and prices is manifest. Approximately two-thirds of the cost of producing a ton of coal is represented by wages. Fair prices necessarily depend upon the cost of production; and since wages constitute so large a proportion of the cost, prices cannot be fixed with any proper relation to cost without taking into consideration this major element. If one of them becomes uncertain, uncertainty with respect to the other necessarily ensues.

So much is recognized by the code itself. The introductory clause of Part III declares that the conditions respecting labor relations are "To effectuate the purposes of this Act." And subdivision (a) of Part II, quoted in the forepart of this opinion, reads in part: "In order to sustain the stabilization of wages, working conditions, and maximum hours of labor, said prices shall be established so as to yield a return per net ton for each district in a minimum price area, . . . equal as nearly as may be to the weighted average of the total costs, per net ton . . ." Thus wages, hours of labor, and working conditions are to be so adjusted as to effectuate the purposes of the act; and prices are to be so regulated as to *stabilize* wages, working conditions, and hours of labor which have been or are to be fixed under the labor provisions. The two are so woven together as to render the probability plain enough that uniform prices, in the opinion of Congress, could not be fairly fixed or effectively regulated, without also regulating these elements of labor which enter so largely into the cost of production.

These two sets of requirements are not like a collection of bricks, some of which may be taken away without disturbing the others, but rather are like the interwoven threads constituting the warp and woof of a fabric, one

set of which cannot be removed without fatal consequences to the whole. Paraphrasing the words of this court in *Butts* v. *Merchants Transportation Co.*, 230 U. S. 126, 133, we inquire—What authority has this court, by construction, to convert the manifest purpose of Congress to regulate production by the mutual operation and interaction of fixed wages and fixed prices into a purpose to regulate the subject by the operation of the latter alone? Are we at liberty to say from the fact that Congress has adopted an entire integrated system that it probably would have enacted a doubtfully-effective fraction of the system? The words of the concurring opinion in the *Schechter* case, 295 U. S. at pages 554–555, are pertinent in reply. "To take from this code the provisions as to wages and the hours of labor is to destroy it altogether. . . . Wages and the hours of labor are essential features of the plan, its very bone and sinew. There is no opportunity in such circumstances for the severance of the infected parts in the hope of saving the remainder." The conclusion is unavoidable that the price-fixing provisions of the code are so related to and dependent upon the labor provisions as conditions, considerations or compensations, as to make it clearly probable that the latter being held bad, the former would not have been passed. The fall of the latter, therefore, carries down with it the former. *International Textbook Co.* v. *Pigg, supra,* p. 113; *Warren* v. *Charlestown,* 2 Gray [Mass.] 84, 98–99.

The price-fixing provisions of the code are thus disposed of without coming to the question of their constitutionality; but neither this disposition of the matter, nor anything we have said, is to be taken as indicating that the court is of opinion that these provisions, if separately enacted, could be sustained.

If there be in the act provisions, other than those we have considered, that may stand independently, the

question of their validity is left for future determination when, if ever, that question shall be presented for consideration.

The decrees in Nos. 636, 649, and 650 must be reversed and the causes remanded for further consideration in conformity with this opinion. The decree in No. 651 will be affirmed.

*It is so ordered.*

Separate opinion of MR. CHIEF JUSTICE HUGHES.

I agree that the stockholders were entitled to bring their suits; that, in view of the question whether any part of the Act could be sustained, the suits were not premature; that the so-called tax is not a real tax, but a penalty; that the constitutional power of the Federal Government to impose this penalty must rest upon the commerce clause, as the Government concedes; that production—in this case mining—which precedes commerce, is not itself commerce; and that the power to regulate commerce among the several States is not a power to regulate industry within the State.

The power to regulate interstate commerce embraces the power to protect that commerce from injury, whatever may be the source of the dangers which threaten it, and to adopt any appropriate means to that end. *Second Employers' Liability Cases,* 223 U. S. 1, 51. Congress thus has adequate authority to maintain the orderly conduct of interstate commerce and to provide for the peaceful settlement of disputes which threaten it. *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, 570. But Congress may not use this protective authority as a pretext for the exertion of power to regulate activities and relations within the States which affect interstate commerce only indirectly. Otherwise, in view of the multitude of indirect effects, Congress in its discretion

could assume control of virtually all the activities of the people to the subversion of the fundamental principle of the Constitution. If the people desire to give Congress the power to regulate industries within the State, and the relations of employers and employees in those industries, they are at liberty to declare their will in the appropriate manner, but it is not for the Court to amend the Constitution by judicial decision.

I also agree that subdivision (g) of Part III of the prescribed Code is invalid upon three counts: (1) It attempts a broad delegation of legislative power to fix hours and wages without standards or limitation. The Government invokes the analogy of legislation which becomes effective on the happening of a specified event, and says that in this case the event is the agreement of a certain proportion of producers and employees, whereupon the other producers and employees become subject to legal obligations accordingly. I think that the argument is unsound and is pressed to the point where the principle would be entirely destroyed. It would remove all restrictions upon the delegation of legislative power, as the making of laws could thus be referred to any designated officials or private persons whose orders or agreements would be treated as "events," with the result that they would be invested with the force of law having penal sanctions. (2) The provision permits a group of producers and employees, according to their own views of expediency, to make rules as to hours and wages for other producers and employees who were not parties to the agreement. Such a provision, apart from the mere question of the delegation of legislative power, is not in accord with the requirement of due process of law which under the Fifth Amendment dominates the regulations which Congress may impose. (3) The provision goes beyond any proper measure of protection of interstate

commerce and attempts a broad regulation of industry within the State.

But that is not the whole case. The Act also provides for the regulation of the prices of bituminous coal sold in interstate commerce and prohibits unfair methods of competition in interstate commerce. Undoubtedly transactions in carrying on interstate commerce are subject to the federal power to regulate that commerce and the control of charges and the protection of fair competition in that commerce are familiar illustrations of the exercise of the power, as the Interstate Commerce Act, the Packers and Stockyards Act, and the Anti-Trust Acts abundantly show. The Court has repeatedly stated that the power to regulate interstate commerce among the several States is supreme and plenary. *Minnesota Rate Cases*, 230 U. S. 352, 398. It is "complete in itself, and may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." *Gibbons* v. *Ogden*, 9 Wheat. 1, 196. We are not at liberty to deny to the Congress, with respect to interstate commerce, a power commensurate with that enjoyed by the States in the regulation of their internal commerce. See *Nebbia* v. *New York*, 291 U. S. 502.

Whether the policy of fixing prices of commodities sold in interstate commerce is a sound policy is not for our consideration. The question of that policy, and of its particular applications, is for Congress. The exercise of the power of regulation is subject to the constitutional restriction of the due process clause, and if in fixing rates, prices or conditions of competition, that requirement is transgressed, the judicial power may be invoked to the end that the constitutional limitation may be maintained. *Interstate Commerce Comm'n* v. *Union Pacific R. Co.*, 222 U. S. 541, 547; *St. Joseph Stock Yards Co.* v. *United States, ante,* p. 38.

In the legislation before us, Congress has set up elaborate machinery for the fixing of prices of bituminous coal sold in interstate commerce. That provision is attacked *in limine*. Prices have not yet been fixed. If fixed, they may not be contested. If contested, the Act provides for review of the administrative ruling. If in fixing prices, due process is violated by arbitrary, capricious or confiscatory action, judicial remedy is available. If an attempt is made to fix prices for sales in intrastate commerce, that attempt will also be subject to attack by appropriate action. In that relation it should be noted that in the *Carter* cases, the court below found that substantially all the coal mined by the Carter Coal Company is sold f. o. b. mines and is transported into States other than those in which it is produced for the purpose of filling orders obtained from purchasers in such States. Such transactions are in interstate commerce. *Savage* v. *Jones*, 225 U. S. 501, 520. The court below also found that "the interstate distribution and sale and the intrastate distribution and sale" of the coal are so "intimately and inextricably connected" that "the regulation of interstate transactions of distribution and sale cannot be accomplished effectively without discrimination against interstate commerce unless transactions of intrastate distribution and sale be regulated." Substantially the same situation is disclosed in the *Kentucky* cases. In that relation, the Government invokes the analogy of transportation rates. *Shreveport Case*, 234 U. S. 342; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563. The question will be the subject of consideration when it arises in any particular application of the Act.

Upon what ground, then, can it be said that this plan for the regulation of transactions in interstate commerce in coal is beyond the constitutional power of Congress? The Court reaches that conclusion in the view that the

invalidity of the labor provisions requires us to condemn the Act in its entirety. I am unable to concur in that opinion. I think that the express provisions of the Act preclude such a finding of inseparability.

This is admittedly a question of statutory construction; and hence we must search for the intent of Congress. And in seeking that intent we should not fail to give full weight to what Congress itself has said upon the very point. The Act provides (§ 15):

"If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act and the application of such provisions to other persons or circumstances shall not be affected thereby."

That is a flat declaration against treating the provisions of the Act as inseparable. It is a declaration which Congress was competent to make. It is a declaration which reverses the presumption of indivisibility and creates an opposite presumption. *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165, 184.

The above quoted provision does not stand alone. Congress was at pains to make a declaration of similar import with respect to the provisions of the Code (§ 3):

"No producer shall by reason of his acceptance of the code provided for in section 4 or of the drawback of taxes provided in section 3 of this Act be held to be precluded or estopped from contesting the constitutionality of any provision of said code, or its validity as applicable to such producer."

This provision evidently contemplates, when read with the one first quoted, that a stipulation of the Code may be found to be unconstitutional and yet that its invalidity shall not be regarded as affecting the obligations attaching to the remainder.

I do not think that the question of separability should be determined by trying to imagine what Congress would

have done if certain provisions found to be invalid were excised. That, if taken broadly, would lead us into a realm of pure speculation. Who can tell amid the host of divisive influences playing upon the legislative body what its reaction would have been to a particular excision required by a finding of invalidity? The question does not call for speculation of that sort but rather for an inquiry whether the provisions are inseparable by virtue of inherent character. That is, when Congress states that the provisions of the Act are not inseparable and that the invalidity of any provision shall not affect others, we should not hold that the provisions are inseparable unless their nature, by reason of an inextricable tie, demands that conclusion.

All that is said in the preamble of the Act, in the directions to the Commission which the Act creates, and in the stipulations of the Code, is subject to the explicit direction of Congress that the provisions of the statute shall not be treated as forming an indivisible unit. The fact that the various requirements furnish to each other mutual aid and support does not establish indivisibility. The purpose of Congress, plainly expressed, was that if a part of that aid were lost, the whole should not be lost. Congress desired that the Act and Code should be operative so far as they met the constitutional test. Thus we are brought, as I have said, to the question whether, despite this purpose of Congress, we must treat the marketing provisions and the labor provisions as inextricably tied together because of their nature. I find no such tie. The labor provisions are themselves separated and placed in a separate part (Part III) of the Code. It seems quite clear that the validity of the entire Act cannot depend upon the provisions as to hours and wages in paragraph (g) of Part III. For what was contemplated by that paragraph is manifestly independent of

the other machinery of the Act, as it cannot become effective unless the specified proportion of producers and employees reach an agreement as to particular wages and hours. And the provision for collective bargaining in paragraphs (a) and (b) of Part III is apparently made separable from the Code itself by § 9 of the Act, providing, in substance, that the employees of all producers shall have the right of collective bargaining even when producers do not accept or maintain the Code.

The marketing provisions (Part II) of the Code naturally form a separate category. The interdependence of wages and prices is no clearer in the coal business than in transportation. But the broad regulation of rates in order to stabilize transportation conditions has not carried with it the necessity of fixing wages. Again, the requirement, in paragraph (a) of Part II that district boards shall establish prices so as to yield a prescribed "return per net ton" for each district in a minimum price area, in order "to sustain the stabilization of wages, working conditions and maximum hours of labor," does not link the marketing provisions to the labor provisions by an unbreakable bond. Congress evidently desired stabilization through both the provisions relating to marketing and those relating to labor, but the setting up of the two sorts of requirements did not make the one dependent upon the validity of the other. It is apparent that they are not so interwoven that they cannot have separate operation and effect. The marketing provisions in relation to interstate commerce can be carried out as provided in Part II without regard to the labor provisions contained in Part III. That fact, in the light of the congressional declaration of separability, should be considered of controlling importance.

In this view, the Act, and the Code for which it provides, may be sustained in relation to the provisions for

marketing in interstate commerce, and the decisions of the courts below, so far as they accomplish that result, should be affirmed.

Mr. Justice Cardozo (dissenting in Nos. 636, 649 and 650, and in No. 651 concurring in the result).

My conclusions compendiously stated are these:

(a) Part II of the statute sets up a valid system of price-fixing as applied to transactions in interstate commerce and to those in intrastate commerce where interstate commerce is directly or intimately affected. The prevailing opinion holds nothing to the contrary.

(b) Part II, with its system of price-fixing, is separable from Part III, which contains the provisions as to labor considered and condemned in the opinion of the court.

(c) Part II being valid, the complainants are under a duty to come in under the code, and are subject to a penalty if they persist in a refusal.

(d) The suits are premature in so far as they seek a judicial declaration as to the validity or invalidity of the regulations in respect of labor embodied in Part III. No opinion is expressed either directly or by implication as to those aspects of the case. It will be time enough to consider them when there is the threat or even the possibility of imminent enforcement. If that time shall arrive, protection will be given by clear provisions of the statute (§ 3) against any adverse inference flowing from delay or acquiescence.

(e) The suits are not premature to the extent that they are intended to avert a present wrong, though the wrong upon analysis will be found to be unreal.

The complainants are asking for a decree to restrain the enforcement of the statute in all or any of its provisions on the ground that it is a void enactment, and void in all its parts. If some of its parts are valid and are separable from others that are or may be void, and if the parts upheld and separated are sufficient to sustain a

regulatory penalty, the injunction may not issue and hence the suits must fail. There is no need when that conclusion has been reached to stir a step beyond. Of the provisions not considered, some may never take effect, at least in the absence of future happenings which are still uncertain and contingent. Some may operate in one way as to one group and in another way as to others according to particular conditions as yet unknown and unknowable. A decision in advance as to the operation and validity of separable provisions in varying contingencies is premature and hence unwise. "The court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.' *Steamship Co.* v. *Emigration Commissioners,* 113 U. S. 33, 39; *Abrams* v. *Van Schaick,* 293 U. S. 188; *Wilshire Oil Co.* v. *United States,* 295 U. S. 100. 'It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' *Burton* v. *United States,* 196 U. S. 283, 295." Per Brandeis, J., in *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346. The moment we perceive that there are valid and separable portions, broad enough to lay the basis for a regulatory penalty, inquiry should halt. The complainants must conform to whatever is upheld, and as to parts excluded from the decision, especially if the parts are not presently effective, must make their protest in the future when the occasion or the need arises.

*First:* I am satisfied that the Act is within the power of the central government in so far as it provides for minimum and maximum prices upon sales of bituminous coal in the transactions of interstate commerce and in those of intrastate commerce where interstate commerce is directly or intimately affected. Whether it is valid also in other provisions that have been considered and condemned in the opinion of the court, I do not find it necessary to determine at this time. Silence must not be taken as importing acquiescence. Much would have

to be written if the subject, even as thus restricted were to be explored through all its implications, historical and economic as well as strictly legal. The fact that the prevailing opinion leaves the price provisions open for consideration in the future makes it appropriate to forego a fullness of elaboration that might otherwise be necessary. As a system of price fixing the Act is challenged upon three grounds: (1) because the governance of prices is not within the commerce clause; (2) because it is a denial of due process forbidden by the Fifth Amendment; and (3) because the standards for administrative action are indefinite, with the result that there has been an unlawful delegation of legislative power.

(1) With reference to the first objection, the obvious and sufficient answer is, so far as the Act is directed to interstate transactions, that sales made in such conditions constitute interstate commerce, and do not merely "affect" it. *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, 290; *Flanagan* v. *Federal Coal Co.,* 267 U. S. 222, 225; *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50, 60; *Public Utilities Comm'n* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83, 90; *Federal Trade Comm'n* v. *Pacific States Paper Trade Assn.,* 273 U. S. 52, 64. To regulate the price for such transactions is to regulate commerce itself, and not alone its antecedent conditions or its ultimate consequences. The very act of sale is limited and governed. Prices in interstate transactions may not be regulated by the states. *Baldwin* v. *Seelig,* 294 U. S. 511. They must therefore be subject to the power of the nation unless they are to be withdrawn altogether from governmental supervision. Cf. *Head Money Cases,* 112 U. S. 580, 593; Story, Commentaries on the Constitution, § 1082. If such a vacuum were permitted, many a public evil incidental to interstate transactions would be left without a remedy. This does not mean, of course, that prices may be fixed for arbitrary reasons or in an arbitrary way. The commerce power of the nation is

subject to the requirement of due process like the police power of the states. *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 156; cf. *Brooks* v. *United States,* 267 U. S. 432, 436, 437; *Nebbia* v. *New York,* 291 U. S. 502, 524. Heed must be given to similar considerations of social benefit or detriment in marking the division between reason and oppression. The evidence is overwhelming that Congress did not ignore those considerations in the adoption of this Act. What is to be said in that regard may conveniently be postponed to the part of the opinion dealing with the Fifth Amendment.

Regulation of prices being an exercise of the commerce power in respect of interstate transactions, the question remains whether it comes within that power as applied to intrastate sales where interstate prices are directly or intimately affected. Mining and agriculture and manufacture are not interstate commerce considered by themselves, yet their relation to that commerce may be such that for the protection of the one there is need to regulate the other. *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 544, 545, 546. Sometimes it is said that the relation must be "direct" to bring that power into play. In many circumstances such a description will be sufficiently precise to meet the needs of the occasion. But a great principle of constitutional law is not susceptible of comprehensive statement in an adjective. The underlying thought is merely this, that "the law is not indifferent to considerations of degree." *Schechter Poultry Corp.* v. *United States, supra,* concurring opinion, p. 554. It cannot be indifferent to them without an expansion of the commerce clause that would absorb or imperil the reserved powers of the states. At times, as in the case cited, the waves of causation will have radiated so far that their undulatory motion, if discernible at all, will be too faint or obscure, too broken by crosscurrents, to be heeded by the law. In such circum-

stances the holding is not directed at prices or wages considered in the abstract, but at prices or wages in particular conditions. The relation may be tenuous or the opposite according to the facts. Always the setting of the facts is to be viewed if one would know the closeness of the tie. Perhaps, if one group of adjectives is to be chosen in preference to another, "intimate" and "remote" will be found to be as good as any. At all events, "direct" and "indirect," even if accepted as sufficient, must not be read too narrowly. Cf. Stone, J., in *Di Santo* v. *Pennsylvania*, 273 U. S. 34, 44. A survey of the cases shows that the words have been interpreted with suppleness of adaptation and flexibility of meaning. The power is as broad as the need that evokes it.

One of the most common and typical instances of a relation characterized as direct has been that between interstate and intrastate rates for carriers by rail where the local rates are so low as to divert business unreasonably from interstate competitors. In such circumstances Congress has the power to protect the business of its carriers against disintegrating encroachments. *Shreveport Case*, 234 U. S. 342, 351, 352; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 588; *United States* v. *Louisiana,* 290 U. S. 70, 75; *Florida* v. *United States,* 292 U. S. 1. To be sure, the relation even then may be characterized as indirect if one is nice or over-literal in the choice of words. Strictly speaking, the intrastate rates have a primary effect upon the intrastate traffic and not upon any other, though the repercussions of the competitive system may lead to secondary consequences affecting interstate traffic also. *Atlantic Coast Line R. Co.* v. *Florida,* 295 U. S. 301, 306. What the cases really mean is that the causal relation in such circumstances is so close and intimate and obvious as to permit it to be called direct without subjecting the word to an unfair or excessive strain. There is a like imme-

diacy here. Within rulings the most orthodox, the prices
for intrastate sales of coal have so inescapable a relation
to those for interstate sales that a system of regulation
for transactions of the one class is necessary to give adequate
protection to the system of regulation adopted for
the other. The argument is strongly pressed by intervening
counsel that this may not be true in all communities
or in exceptional conditions. If so, the operators
unlawfully affected may show that the Act to that extent
is invalid as to them. Such partial invalidity is plainly
an insufficient basis for a declaration that the Act is invalid
as a whole. *Dahnke-Walker Co.* v. *Bondurant*,
*supra*, p. 289; *DuPont* v. *Commissioner*, 289 U. S. 685,
688.

What has been said in this regard is said with added
certitude when complainants' business is considered in
the light of the statistics exhibited in the several records.
In No. 636, the Carter case, the complainant has admitted
that "substantially all" (over 97½%) of the sales
of the Carter Company are made in interstate commerce.
In No. 649 the percentages of intrastate sales are, for one
of the complaining companies, twenty-five per cent, for
another one per cent, and for most of the others two per
cent or four. The Carter Company has its mines in West
Virginia; the mines of the other companies are located
in Kentucky. In each of those states, moreover, coal
from other regions is purchased in large quantities, and
is thus brought into competition with the coal locally
produced. Plainly, it is impossible to say either from
the statute itself or from any figures laid before us that
interstate sales will not be prejudicially affected in West
Virginia and Kentucky if intrastate prices are maintained
on a lower level. If it be assumed for present purposes
that there are other states or regions where the
effect may be different, the complainants are not the
champions of any rights except their own. *Hatch* v.

*Reardon,* 204 U. S. 152, 160, 161; *Premier-Pabst Sales Co. v. Grosscup, ante,* p. 226.

(2) The commerce clause being accepted as a sufficient source of power, the next inquiry must be whether the power has been exercised consistently with the Fifth Amendment. In the pursuit of that inquiry, *Nebbia* v. *New York,* 291 U. S. 502, lays down the applicable principle. There a statute of New York prescribing a minimum price for milk was upheld against the objection that price-fixing was forbidden by the Fourteenth Amendment.[1] We found it a sufficient reason to uphold the challenged system that "the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interest, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself." 291 U. S. at p. 538.

All this may be said, and with equal, if not greater force, of the conditions and practices in the bituminous coal industry, not only at the enactment of this statute in August, 1935, but for many years before. Overproduction was at a point where free competition had been degraded into anarchy. Prices had been cut so low that profit had become impossible for all except the lucky

---

[1] *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 156: "The war power of the United States, like its other powers and like the police power of the States, is subject to applicable constitutional limitations (*Ex parte Milligan,* 4 Wall. 2, 121–127; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505, 571; *McCray* v. *United States,* 195 U. S. 27, 61; *United States* v. *Cress,* 243 U. S. 316, 326); but the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power. *In re Kemmler,* 136 U. S. 436, 448; *Carroll* v. *Greenwich Ins. Co.,* 199 U. S. 401, 410." Cf. *Brooks* v. *United States,* 267 U. S. 432, 436, 437; *Nebbia* v. *New York,* 291 U. S. 502, 524.

handful. Wages came down along with prices and with profits. There were strikes, at times nation-wide in extent, at other times spreading over broad areas and many mines, with the accompaniment of violence and bloodshed and misery and bitter feeling. The sordid tale is unfolded in many a document and treatise. During the twenty-three years between 1913 and 1935, there were nineteen investigations or hearings by Congress or by specially created commissions with reference to conditions in the coal mines.[2] The hope of betterment was faint unless the industry could be subjected to the compulsion of a code. In the weeks immediately preceding the passage of this Act the country was threatened once more with a strike of ominous proportions. The plight of the industry was not merely a menace to owners and to mine workers: it was and had long been a menace to the public, deeply concerned in a steady and uniform supply of a fuel so vital to the national economy.

Congress was not condemned to inaction in the face of price wars and wage wars so pregnant with disaster. Commerce had been choked and burdened; its normal flow had been diverted from one state to another; there had been bankruptcy and waste and ruin alike for capital and for labor. The liberty protected by the Fifth Amendment does not include the right to persist in this anarchic riot. "When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry." *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 372. The free competition so often figured as a social good imports order and moderation and a decent regard for the welfare of the group. Cf. *Sugar Institute, Inc.* v.

---

[2] The dates and titles are given in the brief for the Government in No. 636, at pp. 15–18.

*United States,* 297 U. S. 553. There is testimony in these records, testimony even by the assailants of the statute, that only through a system of regulated prices can the industry be stabilized and set upon the road of orderly and peaceful progress.[3] If further facts are looked for, they are narrated in the findings as well as in congressional reports and a mass of public records.[4] After making every allowance for difference of opinion as to the most efficient cure, the student of the subject is confronted with the indisputable truth that there were ills to be corrected, and ills that had a direct relation to the maintenance of commerce among the states without friction or diversion. An evil existing, and also the power to correct it, the lawmakers were at liberty to use their own discretion in the selection of the means.[5]

(3) Finally, and in answer to the third objection to the statute in its price-fixing provisions, there has been no excessive delegation of legislative power. The prices

[3] See also the Report of the Fifteenth Annual Meeting of the National Coal Association, October 26–27, 1934, and the statement of the resolutions adopted at the Sixteenth Annual Meeting as reported at hearings preliminary to the passage of this Act. Hearings before a Subcommittee of the Committee on Ways and Means, House of Representatives, 74th Congress, 1st Sesssion, on H. R. 8479, pp. 20, 152.

[4] There is significance in the many bills proposed to the Congress after painstaking reports during successive national administrations with a view to the regulation of the coal industry by Congressisonal action. S. 2557, October 4, 1921, 67th Cong., 1st Sess.; S. 3147, February 13, 1922, 67th Cong., 2nd Sess.; H. R. 9222, February 11, 1926, 69th Cong., 1st Sess.; H. R. 11898, May 4, 1926 (S. 4177), 69th Cong., 1st Sess.; S. 2935, January 7, 1932 (H. R. 7536), 72nd Cong., 1st Sess.; also same session H. R. 12916 and 9924.

[5] "Price control, like any other form of discrimination, is unconstitutional only if arbitrary, discriminatory or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." *Nebbia* v. *New York, supra,* at p. 538.

to be fixed by the District Boards and the Commission must conform to the following standards: they must be just and equitable; they must take account of the weighted average cost of production for each minimum price area; they must not be unduly prejudicial or preferential as between districts or as between producers within a district; and they must reflect as nearly as possible the relative market value of the various kinds, qualities and sizes of coal, at points of delivery in each common consuming market area; to the end of affording the producers in the several districts substantially the same opportunity to dispose of their coals on a competitive basis as has heretofore existed. The minimum for any district shall yield a return, per net ton, not less than the weighted average of the total costs per net ton of the tonnage of the minimum price area; the maximum for any mine, if a maximum is fixed, shall yield a return not less than cost plus a reasonable profit. Reasonable prices can as easily be ascertained for coal as for the carriage of passengers or property under the Interstate Commerce Act, or for the services of brokers in the stockyards (*Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420), or for the use of dwellings under the Emergency Rent Laws (*Block* v. *Hirsh,* 256 U. S. 135, 157; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242), adopted at a time of excessive scarcity, when the laws of supply and demand no longer gave a measure for the ascertainment of the reasonable. The standards established by this Act are quite as definite as others that have had the approval of this court. *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 24; *Federal Radio Comm'n* v. *Nelson Bros. Bond & Mortgage Co.,* 289 U. S. 266, 286; *Tagg Bros. & Moorhead* v. *United States, supra; Mahler* v. *Eby,* 264 U. S. 32. Certainly a bench of judges, not experts in the coal business, cannot

say with assurance that members of a commission will be unable, when advised and informed by others experienced in the industry, to make the standards workable, or to overcome through the development of an administrative technique many obstacles and difficulties that might be baffling or confusing to inexperience or ignorance.

The price provisions of the Act are contained in a chapter known as Part II. The final subdivisions of that part enumerate certain forms of conduct which are denounced as "unfair methods of competition." For the most part the prohibitions are ancillary to the fixing of a minimum price. The power to fix a price carries with it the subsidiary power to forbid and prevent evasion. Cf. *United States* v. *Ferger,* 250 U. S. 199. The few prohibitions that may be viewed as separate are directed to situations that may never be realized in practice. None of the complainants threatens or expresses the desire to do these forbidden acts. As to those phases of the statute the suits are premature.

*Second:* The next inquiry must be whether Part I of the statute which creates the administrative agencies, and Part II, which has to do in the main with the price-fixing machinery, as well as preliminary sections levying a tax or penalty, are separable from Part III, which deals with labor relations in the industry, with the result that what is earlier would stand if what is later were to fall.

The statute prescribes the rule by which construction shall be governed. "If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act and the application of such provisions to other persons or circumstances shall not be affected thereby." § 15. The rule is not read as an inexorable mandate. *Dorchy* v. *Kansas,* 264 U. S. 286, 290; *Utah Power & Light Co.* v. *Pfost,* 286

U. S. 165, 184; *Railroad Retirement Board* v. *Alton R. Co.*, 295 U. S. 330, 362. It creates a "presumption of divisibility," which is not applied mechanically or in a manner to frustrate the intention of the lawmakers. Even so, the burden is on the litigant who would escape its operation. Here the probabilities of intention are far from overcoming the force of the presumption. They fortify and confirm it. A confirmatory token is the formal division of the statute into "Parts" separately numbered. Part III which deals with labor is physically separate from everything that goes before it. But more convincing than the evidences of form and structure, the division into chapters and sections and paragraphs, each with its proper subject matter, are the evidences of plan and function. Part II, which deals with prices, is to take effect at once, or as soon as the administrative agencies have finished their administrative work. Part III in some of its most significant provisions, the section or subdivision in respect of wages and the hours of labor, may never take effect at all. This is clear beyond the need for argument from the mere reading of the statute. The maximum hours of labor may be fixed by agreement between the producers of more than two thirds of the annual national tonnage production for the preceding calendar year and the representatives of more than one half the mine workers. Wages may be fixed by agreement or agreements negotiated by collective bargaining in any district or group of two or more districts between representatives of producers of more than two thirds of the annual tonnage production of such districts or each of such districts in a contracting group during the preceding calendar year, and representatives of the majority of the mine workers therein. It is possible that none of these agreements as to hours and wages will ever be made. If made, they may not be completed for months or even years. In the meantime, however, the provi-

sions of Part II will be continuously operative, and will determine prices in the industry. Plainly, then, there was no intention on the part of the framers of the statute that prices should not be fixed if the provisions for wages or hours of labor were found to be invalid.

Undoubtedly the rules as to labor relations are important provisions of the statute. Undoubtedly the lawmakers were anxious that provisions so important should have the force of law. But they announced with all the directness possible for words that they would keep what they could have if they could not have the whole. Stabilizing prices would go a long way toward stabilizing labor relations by giving the producers capacity to pay a living wage.[6] To hold otherwise is to ignore the whole history of mining. All in vain have official committees

---

[6] At a hearing before a Subcommittee of the Committee on Ways and Means, House of Representatives, 74th Congress, First Session, on H. R. 8479, counsel for the United Mine Workers of America, who had coöperated in the drafting of the Act, said (p. 35):

"We have, as can be well understood, a provision of this code dealing with labor relations at the mines. We think that is justified; we think it is impossible to conceive of any regulation of this industry that does not provide for regulation of labor relations at the mines. I realize that while it may be contested, yet I feel that it is going to be sustained.

"Also, there is a provision in this act that if this act, or any part of it, is declared to be invalid as affecting any person or persons, the rest of it will be valid, and if the other provisions of this act still stand and the labor provisions are struck down, we still want the act, because it stabilizes the industry and enables us to negotiate with them on a basis which will at least be different from what we have been confronted with since April, and that is a disinclination to even negotiate a labor wage scale because they claim they are losing money.

"If the labor provisions go down, we still want the industry stabilized so that our union may negotiate with them on the basis of a living American wage standard."

inquired and reported in thousands of printed pages if this lesson has been lost. In the face of that history the court is now holding that Congress would have been unwilling to give the force of law to the provisions of Part II, which were to take effect at once, if it could not have Part III, which in the absence of agreement between the employers and the miners would never take effect at all. Indeed, the prevailing opinion goes so far, it seems, as to insist that if the least provision of the statute in any of the three chapters is to be set aside as void, the whole statute must go down, for the reason that everything from end to end, or everything at all events beginning with § 4, is part of the Bituminous Coal Code, to be swallowed at a single draught, without power in the commission or even in the court to abate a jot or tittle. One can only wonder what is left of the "presumption' of divisibility" which the law-makers were at pains to establish later on. Codes under the National Recovery Act are not a genuine analogy. The Recovery Act made it mandatory (§ 7a) that every code should contain provisions as to labor, including wages and hours, and left everything else to the discretion of the codifiers. Wages and hours in such circumstances were properly described as "essential features of the plan, its very bone and sinew" (*Schechter Poultry Corp.* v. *United States, supra,* concurring opinion, p. 555), which taken from the body of a code would cause it to collapse. Here on the face of the statute the price provisions of one Part and the labor provisions of the other (the two to be administered by separate agencies) are made of equal rank.

What is true of the sections and subdivisions that deal with wages and the hours of labor is true also of the other provisions of the same chapter of the Act. Employees are to have the right to organize and bargain collectively through representatives of their own choos-

ing, and shall be free from interference, restraint or co-
ercion of employers, or their agents, in the designation of
such representatives, or in self-organization or in other
concerted activities for the purpose of collective bargain-
ing or other mutual aid or protection, and no employee
and no one seeking employment shall be required as a con-
dition of employment to join any company union. No
threat has been made by any one to do violence to the
enjoyment of these immunities and privileges. No at-
tempt to violate them may be made by the complainants
or indeed by any one else in the term of four years during
which the Act is to remain in force. By another subdi-
vision employees are to have the right of peaceable as-
semblage for the discussion of the principles of collective
bargaining, shall be entitled to select their own check-
weighman to inspect the weighing or measuring of coal,
and shall not be required as a condition of employment
to live in company houses or to trade at the store of the
employer. None of these privileges or immunities has
been threatened with impairment. No attempt to im-
pair them may ever be made by any one.

Analysis of the statute thus leads to the conclusion
that the provisions of Part III, so far as summarized, are
separable from Parts I and II, and that any declaration
in respect of their validity or invalidity under the com-
merce clause of the Constitution or under any other sec-
tion will anticipate a controversy that may never become
real. This being so, the proper course is to withhold an
expression of opinion until expression becomes necessary.
A different situation would be here if a portion of the
statute, and a portion sufficient to uphold the regulatory
penalty, did not appear to be valid. If the whole statute
were a nullity, the complainants would be at liberty to
stay the hand of the tax-gatherer threatening to collect
the penalty, for collection in such circumstances would
be a trespass, an illegal and forbidden act. *Child Labor*

*Tax Case*, 259 U. S. 20; *Hill* v. *Wallace*, 259 U. S. 44, 62; *Terrace* v. *Thompson*, 263 U. S. 197, 215; *Pierce* v. *Society of Sisters*, 268 U. S. 510, 536. It would be no answer to say that the complainants might avert the penalty by declaring themselves code members (§ 3) and fighting the statute afterwards. In the circumstances supposed there would be no power in the national government to put that constraint upon them. The Act by hypothesis being void in all its parts as a regulatory measure, the complainants might stand their ground, refuse to sign anything, and resist the onslaught of the collector as the aggression of a trespasser. But the case as it comes to us assumes a different posture, a posture inconsistent with the commission of a trespass either present or prospective. The hypothesis of complete invalidity has been shown to be unreal. The price provisions being valid, the complainants were under a duty to come in under the code, whether the provisions as to labor are valid or invalid, and their failure to come in has exposed them to a penalty lawfully imposed. They are thus in no position to restrain the acts of the collector, or to procure a judgment defeating the operation of the statute, whatever may be the fate hereafter of particular provisions not presently enforcible. The right to an injunction failing, the suits must be dismissed. Nothing more is needful—no pronouncement more elaborate—for a disposition of the controversy.

A last assault upon the statute is still to be repulsed. The complainants take the ground that the Act may not coerce them through the imposition of a penalty into a seeming recognition or acceptance of the code, if any of the code provisions are invalid, however separable from others. I cannot yield assent to a position so extreme. It is one thing to impose a penalty for refusing to come in under a code that is void altogether. It is a very different thing if a penalty is imposed for

refusing to come in under a code invalid at the utmost in separable provisions, not immediately operative, the right to contest them being explicitly reserved. The penalty in those circumstances is adopted as a lawful sanction to compel submission to a statute having the quality of law. A sanction of that type is the one in controversy here. So far as the provisions for collective bargaining and freedom from coercion are concerned, the same duties are imposed upon employers by § 9 of the statute whether they come in under the code or not. So far as code members are subject to regulation as to wages and hours of labor, the force of the complainants' argument is destroyed when reference is made to those provisions of the statute in which the effect of recognition and acceptance is explained and limited. By § 3 of the Act, "No producer shall by reason of his acceptance of the code provided for in section 4 or of the drawback of taxes provided for in section 3 of this Act be held to be precluded or estopped from contesting the constitutionality of any provision of said code, or its validity as applicable to said producer." These provisions are reinforced and made more definite by §§ 5 (c) and 6 (b), which so far as presently material are quoted in the margin.[7] For the subscriber to the code who is

[7] § 5 (c). "Any producer whose membership in the code and whose right to a drawback on the taxes as provided under this Act has been canceled, shall have the right to have his membership restored upon payment by him of all taxes in full for the time during which it shall be found by the Commission that his violation of the code or of any regulation thereunder, the observance of which is required by its terms, shall have continued. In making its findings under this subsection the Commission shall state specifically (1) the period of time during which such violation continued, and (2) the amount of taxes required to be paid to bring about reinstatement as a code member."

§ 6 (b). "Any person aggrieved by an order issued by the Commission or Labor Board in a proceeding to which such person is a

doubtful as to the validity of some of its requirements, there is thus complete protection. If this might otherwise be uncertain, it would be made clear by our decision in *Ex parte Young*, 209 U. S. 123, which was applied in the court below at the instance and for the benefit of one of these complainants to give relief against penalties accruing during suit. *Helvering* v. *Carter*, No. 651. Finally, the adequacy of the remedial devices is made even more apparent when one remembers that the attack upon the statute in its labor regulations assumes the existence of a controversy that may never become actual. The failure to agree upon a wage scale or upon maximum hours of daily or weekly labor may make the statutory scheme abortive in the very phases and aspects that the court has chosen to condemn. What the code will provide as to wages and hours of labor, or whether it will provide anything, is still in the domain of prophecy. The opinion of the court begins at the wrong end. To adopt a homely form of words, the complainants have been crying before they are really hurt.

My vote is for affirmance.

I am authorized to state that MR. JUSTICE BRANDEIS and MR. JUSTICE STONE join in this opinion.

party may obtain a review of such order in the Circuit Court of Appeals of the United States, within any circuit wherein such person resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the entry of such order, a written petition praying that the order of the Commission or Labor Board be modified or set aside in whole or in part. . . . The judgment and decree of the court, affirming, modifying, and enforcing or setting aside, in whole or in part, any such order of the Commission or Labor Board, as the case may be, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in sections 239 and 240 of the Judicial Code, as amended (U. S. C., title 28, §§ 346 and 347.)"