**UNITED STATES v. CERTAIN LANDS IN CITY OF LOUISVILLE, JEFFERSON COUNTY, KY., et al.**

No. 1769.

District Court, W. D. Kentucky.
Jan. 4, 1935.

T. J. Sparks, U. S. Atty., and Shackelford Miller, Jr., Sp. Atty. of U. S., both of Louisville, Ky., and Lloyd H. Landau and Wilbur Shaw, both of Washington, D. C., for the United States.

Chesley H. Searcy, of Louisville, Ky., for defendants.

C. C. Hieatt, of Louisville, Ky., amicus curiæ.

DAWSON, District Judge.

In this action and in two companion actions, numbered 1770 and 1771, the United States of America seeks to condemn certain property in the city of Louisville, Ky., for the purpose of securing fee-simple title thereto in order to erect thereon a Low-Cost Housing and Slum Clearance Project, under the provisions of the National Industrial Recovery Act (48 Stat. 195). One of the defendants whose property is sought to be condemned in this action is Edward J. Gernert.

Subsequent to filing the petition the plaintiff filed its written motion, asking the court to appoint commissioners to assess the damages of the respective owners of the property described in the petition. Thereafter, and before commissioners were appointed, the defendant Gernert entered his appearance to the action and filed a demurrer to the petition. On the oral argument it developed that the demurrer is based upon the contention of the defendant Gernert that the United States of America is without power to exercise the right of eminent domain for the purpose of acquiring property for Low-Cost Housing and Slum Clearance Projects. Aside from the failure of the petition to allege the inability of the government to acquire the property by contract with the owners, this is the only issue presented, and, as this defect in the petition presumably can be easily cured, I shall treat the case as presenting the sole question of the constitutional power of the United States to acquire, through condemnation, property of citizens for the purposes and uses for which the property here involved is designed.

■ The power of eminent domain is one which is inherent in sovereignty, and, while the Constitution of the United States does not confer this power in express terms upon the national government, there can be no doubt that it possesses such power within the field prescribed for the national government by the Constitution. Indeed, its existence is clearly implied by that provision of the Fifth Amendment which prohibits the taking of private property for public use without just compensation. It is thoroughly settled by decisions of the Supreme Court that the national government has the power to condemn property within a state of the Union for its use for ordinary governmental purposes, such as for post offices, forts, arsenals, locks and dams on navigable streams, courthouses, lighthouses, and the like, and for any other legitimate function of the national government. It is also equally well settled that the national government may condemn property for the establishment of national memorials, commemorating the valor and service of its soldiers and sailors or other public servants, which are open to the enjoyment of, and will serve as an object lesson to, all the people. United States v. Gettysburg Electric Railway Co., 160 U. S. 668, 16 S. Ct. 427, 40 L. Ed. 576. The United States, under the commerce clause of the Constitution (Article 1, § 8, cl. 3), has the power to condemn and to authorize private corporations to condemn rights of way for the construction of interstate railroads, and under the commerce clause and under the power of Congress to establish post roads, to condemn or authorize the condemnation of land for national highways, California v. Central Pacific R. R. Co., 127 U. S. 1, 8 S. Ct. 1073, 32 L. Ed. 150; and I do not think at this late day the power of the national government to condemn property for public parks open to the use of all the people of the United States can be seriously questioned.

The power of the national government, however, to condemn property for purposes such as the one involved here is a new question, and the proper solution of it calls for an examination of the inherent nature of the power of eminent domain.

■ The universal rule in this country is that the states can condemn private property only for a public use, and the language of the Fifth Amendment shows that the framers of the Federal Constitution intended that the national government should be similarly restricted. The prohibition in that amendment against the taking of private property for public use, except upon the payment of just compensation, clearly implies that it cannot be taken for private use at all. However, there are two schools of thought exemplified in the decisions in this country as to the meaning and scope of the words *public use,* when used in connection with the exercise of the power of eminent domain; one holding that public use is synonymous with *public benefit, public advantage,* and *general welfare,* while the other holds that public use means use by the government itself in the performance of governmental functions, or a use or service open or available to all or a part of the public as of right, irrespective of whether the title to the property condemned is vested in the government or in some private agency.

It seems to me that the first theory is an entirely untenable one. The question of whether a certain use is for the public advantage, or is in the interest of the general welfare of the people, is, generally speaking, a matter for legislative determination. If the property of the citizen can be condemned and taken, upon the payment of just compensation, simply because the legislative department of the government may determine that the use to which this property is to be put is for the general welfare, the property of every citizen in this country would be subject to the whims and theories of any temporary majority represented in the leg-

islative branch of the government; and even if the legislative determination that a certain use is for the general welfare and public advantage is subject to judicial review, it is doubtful if the security of private property would be enhanced. The action of the courts in such cases would inevitably reflect the individual views of the judges on the question of public utility and general welfare. If, on the other hand, the right of the government to take the property of the citizen is limited to strictly public uses, it seems to me that both the legislative and the judicial branches of the government are furnished with a fixed and definite guide for their action.

The Supreme Court of Maryland, in the case of Arnsperger v. Crawford, 101 Md. 247, 61 A. 413, 415, 70 L. R. A. 497, in discussing the character of public use authorizing the exercise of the power of eminent domain, used this language: "There will be found two different views of the meaning of these words which have been taken by the courts—one, that there must be a use, or right of use, by the public, or some limited portion of the public; the other, that they are equivalent to public utility or advantage. If the former is the correct view, the Legislature and the courts have a definite, fixed guide for their action. If the latter is to prevail, the enactment of laws upon this subject will reflect the passing popular feeling, and their construction will reflect the various temperaments of the judges, who are thus left free to indulge their own views of public utility or advantage. We cannot hesitate to range this court with those which hold the former to be the true view. We agree with the Pennsylvania court (Farmers' Market Co. v. Philadelphia & R. Terminal Co., 10 Pa. Co. Ct. R. 25) that 'the test whether a use is public or not is whether a public trust is imposed upon the property; whether the public has a legal right to the use, which cannot be gainsaid or denied or withdrawn at the pleasure of the owner.'"

In the case of Healy Lumber Co. v. Morris, 33 Wash. 490, 74 P. 681, 684, 63 L. R. A. 820, 99 Am. St. Rep. 964, the Supreme Court of the State of Washington, in disposing of the contention that "public policy" and "general welfare" are synonymous with "public use" as a basis for the exercise of the power of eminent domain, used this language:

"It might be of unquestionable public policy, and for the best interests of the state, to allow condemnation of lands in every instance where it would result in aiding prosperous business enterprises which would give employment to labor, stimulate trade, increase property values, and thereby increase the revenues of the state, even if the enterprise were purely private, for such is the relation, under our form of government, between public and private prosperity, that one cannot be enjoyed to any appreciable extent without favorably influencing the other. But it is evident that this was not the kind of public use that was within the minds of the framers of the Constitution, and it seems to us that the logic of those courts which have sustained appellant's contention is justified solely on grounds of public policy.

"It seems scarcely necessary to particularize to show to what extent this doctrine might practically be carried. Under such liberal construction, the brewer could successfully demand condemnation of his neighbor's land for the purpose of the erection of a brewery, because, forsooth, many citizens of the state are profitably engaged in the cultivation of hops. Condemnation would be in order for gristmills and for factories for manufacturing the cereals of the state, because there is a large agricultural interest to be sustained. Tanneries, woolen factories, oil refineries, distilleries, packing houses, and machine shops of almost every conceivable kind would be entitled to some consideration for the same reasons; thereby actually destroying any distinctions between public and private use, for the principle in one instance is the same as in the other. The difference is only in degree."

In the case of Bloodgood v. Mohawk & H. River R. Co., 18 Wend. (N. Y.) 9, 31 Am. Dec. 313, the court said: "When we depart from the natural import of the term 'public use', and substitute for the simple idea of a public possession and occupation, that of public utility, public interest, common benefit, general advantage or convenience, or that still more indefinite term public improvement, is there any limitation which can be set to the exertion of legislative will in the appropriation of private property? The moment the mode of its use is disregarded, and we permit ourselves to be governed by speculations upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principle to guide us."

The Court of Appeals of Kentucky, it seems to me, by numerous decisions is in

full accord with the courts just quoted from. See Chesapeake Stone Co. v. Moreland, 126 Ky. 656, 104 S. W. 762, 16 L. R. A. (N. S.) 479; Fitzpatrick v. Warden, 157 Ky. 95, 162 S. W. 550. See, also, Borden v. Trespalacios R. & I. Co., 98 Tex. 494, 86 S. W. 11, 107 Am. St. Rep. 640.

Lewis, in his work on Eminent Domain (3d Ed.) § 258, after a full review of the authorities, and upon an examination of fundamental principles, rejects the theory that "public benefit," "public advantage," "public policy," and "general welfare" are the equivalents of "public use." He says: " 'Public use' means the same as use by the public, and this, it seems to us, is the construction the words should receive in the constitutional provision in question. The reasons which incline us to this view are: First, that it accords with the primary and more commonly understood meaning of the words; second, it accords with the general practice in regard to taking private property for public use in vogue when the phrase was first brought into use in the earlier Constitutions; third, it is the only view which gives the words any force as a limitation, or renders them capable of any definite and practical application. If the Constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public retain certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the public, then the property is not taken for public use and the act of appropriation is void. * * * On the other hand, if the Constitution means that private property may be taken for any purpose of public benefit and utility, what limit is there to the power of the legislature? This view places the whole matter ultimately in the hands of the judiciary, as though the Constitution read that private property may be taken for such purposes as the Supreme Court deem of public benefit or advantage. The public welfare is committed generally to the keeping of the legislature. It is a numerous body, coming directly from the people and supposed to be acquainted with their conditions and needs. All questions of general public welfare and advantage fall appropriately within the province of the legislature. They have opportunities for judging correctly, ways and means of information which the courts do not and can not have. It can not be presumed that the people ever

intended to commit such a question to the courts. Whether the public will have the use of the property taken under a particular statute is a question which may be readily determined from an inspection of the statute, but whether a particular improvement will be of public utility is a question of opinion merely, about which men may differ, and which can not be referred to any definite criterion. 'The moment the mode of use is disregarded, and we permit ourselves to be governed by speculations upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principles to guide us.' "

Therefore, on principle and in view of the authorities referred to, I am of the opinion that the power of eminent domain can be exercised only for a public use, and that such public use means a use by the government for legitimate governmental purposes, or a use open to all the public, even though practically available to only a part of the public, whether the property condemned is held by the government or by some private agency; and this public right to use must result from the law itself, rather than from the will of the governmental agency upon which the power of condemnation is conferred. Measured by these principles, is the proposed use of the property here sought to be condemned a public use?

Section 1 of the National Industrial Recovery Act (15 USCA § 701) declares the existence of a national emergency "productive of wide-spread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people." This section also declares it to be the purpose of Congress, in the enactment of the National Industrial Recovery Act, " * * * to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural prod-

ucts by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

Section 201 (a) of the act (40 USCA § 401 (a) authorizes the President to create a Federal Emergency Administration of Public Works, and to appoint such officers, agents, and employees, including a Federal Emergency Administrator of Public Works, to carry out that part of the act, as the President may determine. Pursuant to that authority the President has appointed Secretary of the Interior Ickes as the Federal Emergency Administrator of Public Works.

Section 202 of the act (40 USCA § 402) directs the Administrator so appointed, under the direction of the President, to prepare a comprehensive program of public works—

" * * * which shall include among other things the following: * * *.

"(d) Construction, reconstruction, alteration, or repair under public regulation or control of low-cost housing and slum-clearance projects."

Section 203 (a) of the act (40 USCA § 403 (a) in part provides: "With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 202 [section 402]; * * * (3) to acquire by purchase, or by exercise of the power of eminent domain, any real or personal property in connection with the construction of any such project, and to sell any security acquired or any property so constructed or acquired or to lease any such property with or without the privilege of purchase: Provided, That all moneys received from any such sale or lease or the repayment of any loan shall be used to retire obligations issued pursuant to Section 209 of this Act [section 410], in addition to any other moneys required to be used for such purpose." (The reference to section 209 is a palpable error, and doubtless should read section 210.)

■ I am satisfied that no court can reasonably disagree with the finding by Congress that a national emergency existed at the time of the enactment of the National Industrial Recovery Act, and I am of the opinion that no court can reasonably find that the emergency has yet passed; but the power of the national government to exercise the right of eminent domain cannot be based upon the existence of a national emergency. The power, if it can be exercised for the purposes for which it is here sought to be used, must exist independently of such emergency. The emergency at most can only afford a reason for its exercise. Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281; Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Home Building & Loan Association v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481.

Therefore, bearing in mind the rule that the national government can exercise the power of eminent domain only for a public use, we must examine the statute under which the power is sought to be exercised to determine if the use contemplated is a "public use," as I have heretofore defined that term. Certainly it is not a public use, in the sense that the property is proposed to be used by the government for performing any of the legitimate functions of the government itself. It is not proposed to use the property for the purpose of erecting buildings thereon to be occupied by any agency of the government in performing its statutory or constitutional functions. Surely it is not a governmental function to construct buildings in a state for the purpose of selling or leasing them to private citizens for occupancy as homes. If such an activity is a governmental function, then the government is likewise possessed of the power to acquire by condemnation farm lands, improve them, and then sell or lease them to citizens. Such a power would likewise include the right to acquire by condemnation live stock and machinery with which to stock such farms so acquired. It would include the power to acquire by condemnation mills, factories, mines, and every conceivable kind of industrial plant, for the purpose of operating them in competition with private industry, or for the purpose of selling or leasing them to whomsoever the government might wish.

■ The very suggestion of the extent to which the exercise of such power might be carried, it seems to me, compels its rejection. The language of the statute forces one to the conclusion that the proposed buildings are to be constructed for the use of those private individuals who may be selected by the agencies of the government for their enjoyment. The right to purchase the buildings or to lease them is not a right made available by the

statute to all of the public upon equal terms, free from the will of governmental agencies, or to any part of the public. The matter of whether the property will be sold or leased, and to whom sold or leased and upon what terms, is entirely within the discretion of the administrative branch of the government, with no rule laid down in the statute which that department is compelled to respect or follow. Therefore, the buildings proposed to be constructed are not to be devoted to a public use, in the sense that they are to be used to house legitimate governmental activities, nor are they to be devoted to a public use in the sense that the statute makes them available as a matter of right and upon equal terms to all the public or any part thereof.

■ Counsel for the government contend that the exercise of the power in this case is authorized by clause 1, § 8, art. 1, of the Constitution, which provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."

It is contended that as this section empowers Congress to levy taxes for the general welfare of the United States, it, of course, possesses the power to appropriate these taxes to the general welfare, and that therefore the government possesses the power to condemn property, to be paid for out of the money thus appropriated and to be devoted to the purposes deemed by Congress to be for the general welfare. Just how far, under this provision of the Constitution, Congress may go in laying taxes and appropriating public money for the general welfare, is an open question; and in view of the holding of the Supreme Court in the case of Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078, that a taxpayer cannot question such appropriations, the limits of the power of Congress in this respect may never be authoritatively determined. It may be conceded, however, that congressional appropriations under this provision of the Constitution are not necessarily limited to those matters expressly committed to the control of Congress by other provisions of the Constitution. On the other hand, it cannot be conceded that this provision is a grant of general authority to Congress to legislate, other than by making appropriations, on any subject deemed by it to be for the general welfare. This clause, by its very terms, restricts

Congress to providing for the general welfare through appropriations only, because it relates only to taxation and to the use of funds raised by taxation. It does not authorize the exercise by Congress of a power not committed to it merely that there may be brought into existence something for which appropriations may be made in the furtherance of general welfare. The power granted is that of laying taxes—not that of providing for the general welfare. The latter is only one of the purposes for which taxes may be levied. Therefore, the general power conferred by the Constitution (Article 1, § 8, cl. 18) upon Congress to make all laws necessary and proper for carrying into execution the enumerated powers of the national government cannot be exercised in aid of any supposed power of Congress to legislate for the general welfare. As to the power conferred in the clause under consideration, the general power referred to can be exercised only in aid of the power to tax, and, of course, to safeguard and control the expenditure of tax money appropriated to the general welfare.

■ No support can be found for the power here sought to be exercised in the well-recognized power of the states to condemn and destroy property found to be a menace to public health or safety. This is an exercise of the police power, not of the power of eminent domain; and the national government is not clothed with any such police power within the states.

The so-called Rent Cases, Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165, and Marcus Brown Co. v. Feldman, 256 U. S. 175, 41 S. Ct. 465, 65 L. Ed. 877, have been cited as persuasive authority for the exercise of the power here claimed; but, as I understand those cases, they throw no light on the problem here presented. Each of those cases involved the extent to which the police power may be exerted in an emergency. The case of Block v. Hirsh involved an act of Congress (Act Oct. 22, 1919, c. 80, 41 Stat. 297) applicable only to the District of Columbia, over which, by virtue of clause 17, § 8, art. 1, of the Constitution, Congress is given exclusive legislative power, including, of course, police power; the other case involved the extent of the exercise of its police power by the state of New York in an emergency. In each of these cases it is clear that the power to legislate for the general welfare exists as an independent substantive power. Here it is clear such a power does not exist.

For the reasons stated, I am forced to conclude that no power resides in the national government to condemn the property here involved for the purposes for which it is intended.

An order will be entered, sustaining the demurrer of the defendant and overruling the motion of the plaintiff to appoint commissioners.