## UNITED STATES HOUSING AUTHORITY, In Re.

Before the Board of Tax Appeals
Department of Taxation of Ohio

No. 184. Decided April 12, 1943.

372

Charles M. Malone, Washington, D. C., for United States Housing Authority.

Francis T. Bartlett, Cincinnati, for Cincinnati Metropolitan Housing Authority.

Carl W. Rich, Prosecuting Attorney, Cincinnati, and Carson Hoy, Asst. Pros. Atty., Cincinnati, for George Guckenberger, Hamilton County Auditor.

W. Ray Skirvin, Cincinnati, for Ethel M. Skirvin, taxpayer.

374

## OPINION

This cause comes before the Board of Tax Appeals upon the application of the United States Housing Authority for exemption from taxation for the year 1939 of certain real property within the city of Cincinnati, Ohio, owned by the United States Housing Authority and leased to the Cincinnati Metropolitan Housing Authority and popularly known as the Laurel Homes Housing Project. Said application was submitted on the stipulation of facts, briefs and argument, including in support of said application, briefs of the applicant and applicant's lessee, the Cincinnati Metropolitan Housing Authority and opposing said application, briefs on behalf of George Guckenberger, Auditor of Hamilton County, Ohio and briefs on behalf of Ethel M. Skirvin, a taxpayer.

The stipulation of facts and the application show that the land upon which the project is now located was acquired by the United States of America from former owners by purchase (not through eminent domain proceedings) at a cost of $1,832,554.27; that construction was started under the Federal Emergency Administration of Public Works; that under the provisions of the United States Housing Act of 1937 by Executive Order No. 7732, dated October 27, 1937, all right, interest and title was transferred from the Federal Emergency Administration of Public Works to the United States Housing Authority; that on completion of said project in May of 1938, it was leased by the United States Housing Authority under the provisions of the United States Housing Act of 1937 and amendments thereto (U. S. Code Title 42, Sec. 1401 et seq.) to the Cincinnati Metropolitan Housing Authority, a body corporate and politic of the state of Ohio, organized and existing under the provisions of the Housing Authority Law of the State of Ohio (§§1078-29 et seq., GC); that since said time, said project has been continuously operated by the Cincinnati Metropolitan Housing Authority as lessee of the United States Housing Authority; that the property involved is located in the closely built-up section of the city of Cincinnati; that it consists of twenty-one multiple family residence buildings (containing 1039 apartments or dwelling units) of fireproof brick and concrete construction each three stories in height, two one-story buildings containing the administrative staff's office, eighteen retail storerooms, a central heating plant, lawns, walks, auto parking areas and children's playgrounds; that the storerooms were rented by advertising for bids and were rented to the highest bidder who was able to pay the rent; that the total cost to the United States Government, including land, construction, etc., was $6,244,-020. 78; that the auditor of Hamilton county entered said property on the tax duplicate for the year 1939 in the name of the United States of America at a total valuation of $3,169,120.00 including the storerooms and lands on which they are situated; that for the year 1937 the total land and buildings (under construction) were as-

sessed at $638,170.00; that in August of 1934 before the United States had acquired any property or drawn any plans, the project manager for the Federal Emergency Administration of Public Works at a meeting with the council of the city of Cincinnati agreed that the full amount of taxes would be paid on the project the same as on private property and that if the Federal Government could not legally pay said taxes, they would pay an amount equal thereto; that in 1941, by ordinance, the city agreed that in lieu of taxes which would amount to $52,000.00 per year, the lessee, the Metropolitan Housing Authority should pay $13,000.00 per year as a service charge of which amount the city would receive a sum equal to its proportion of the total tax rate amounting to $5,736.35 and that the city would furnish to said project and the tenants thereof the same municipal services and facilities as those furnished without charge to other dwellings and inhabitants.

The stipulation of facts herein and certain other papers are denominated an appeal which is in error as this cause in fact is an original application under the provisions of §§5570-1 and 5616, GC, filed with the former Tax Commission of which the Board of Tax Appeals is now the successor and has been throughout these proceedings and is herein so treated.

The question presented is whether said property known as Laurel Homes is exempt from taxation. Applicant contends that said property is exempt on four grounds which we will consider in the order set forth in applicant's brief.

Applicant's first claim is that said property is exempt from taxation being "public property used for a public purpose."

The property involved herein was originally purchased by the United States from private owners and was later transferred to the United States Housing Authority by Executive Order No. 7732 under the provisions of the United States Housing Act of 1937. Said act created the United States Housing Authority as a body corporate "in the Department of Interior and under the general supervision of the Secretary thereof" and declared the same "shall be an agency and instrumentality of the United States." U. S. Code Title 42, Sec. 1403 (a). It would therefore appear that title is in the United States Housing Authority, an instrumentality of the United States. and that said project is being operated by the Cincinnati Metropolitan Housing Authority as lessee of the entire project.

Under §2, Art. XII of the Constitution of Ohio and §5351 GC, public ownership of property is not sufficient to exempt it from taxation. It must also be "used exclusively for any public purpose, * * *." City of Cincinnati v Lewis, Aud., 66 Oh St 49, 55. In considering this question this Board is limited to determining whether the present use of the property is exclusively for any public purpose and the questions of slum clearance, housing conditions, sanitary conditions, public health, safety and welfare referred to

in the briefs filed herein are not involved.  As stated by Judge Turner in **Columbus Metropolitan Housing Authority v Thatcher, 140 Oh St 38, 42:**

"The Board of Tax Appeals being limited to determining whether the **present** use of the property is **exclusively** for any public purpose, we are not concerned with the former use of the property or the reasons for the change.  Therefore, such subjects as slum clearance, the right of condemnation, housing conditions, and health and sanitary measures are not before us.  Admittedly, the property is no longer slum property and the housing, health and sanitary conditions there obtaining are not now a ground of complaint."

In the case of **Columbus Metropolitan Housing Authority, 22 OO 225,** it was held by this Board that the renting of property for commercial use or for the purposes of a private dwelling was not a public use.  We are unable to find any material difference between the use of the property involved herein and the use of the property in that case which was affirmed by the Supreme Court of Ohio in **Columbus Metropolitan Housing Authority v Thatcher, 140 Oh St 38.** While title in that case was in the Columbus Metropolitan Housing Authority and the title in this case is in the United States Housing Authority, both cases involve the application of §2, **Art. XII of the Constitution of Ohio** and §5351 GC.  Upon the principles laid down therein the mere fact that title stands in an instrumentality of the United States of America is not sufficient to exempt said property from taxation.  Upon the principles therein laid down and without again reviewing the authorities, we find that said property is not used exclusively for public purposes.

Applicant's second claim is that said property is exempt from taxation "in that it is property used exclusively for charitable purposes."

This question has been before the courts of this state in numerous cases which are controlling in this matter.  In **Cullitan v Sanitarium, 134 Oh St 99,** the second paragraph of the syllabus is as follows:

"Under the provisions of §5353, GC, enacted pursuant to authority conferred by §2, **Art. XII of the State Constitution,** institutions used exclusively for charitable purposes are exempted from taxation.  Such use being the criterion of such exemption, the right is lost if the property be appropriated to other uses."

In **O'Brien v Hospital Assn., 96 Oh St 1, 8, 9,** it is stated:

"If. however, it uses this property exclusively for hospital purposes, then such hospital must be a public charitable hospital, and

as such its doors must open to those who are unable to pay, the same as they open to those who have the means to contribute further sums to this public charity commensurate in a degree at least with the hospital accommodations they receive. * * * The first concern of a public charitable hospital must be for those who are unable to pay."

In **Gerke, etc. v Purcell, 25 Oh St 229, 248, 249,** the court states:

"But a parsonage, although built on ground which might otherwise be exempt as attached to the church edifice, does not come within the exemption. The ground in such case is appropriated to a new and different use. Instead of its being used exclusively for public worship, it becomes a place of private residence."

"Nor does it seem to us that the question as to whether the parsonages are taxable or not, depends upon their proximity to the church edifice. On the contrary, that question, in our opinion, is to be determined by the direct and immediate uses to which they are applied."

Judge Matthias in the case of **In Re Complaint of Taxpayers, 138 Oh St 287, 290,** stated.

"It is clear from the record in the instant case that appellant's property is not use **exclusively** for charitable purposes, but that its printing establishment is conducted in competition with other commercial printing plants. The use of property exclusively for charitable purposes is the criterion of exemption thereof from taxation."

As to the property herein involved the agreed statement of facts discloses that there are certain retail storerooms which are rented to the highest bidder that is able to pay the rent; that the dwelling units are rented only to families included in certain income groups at a rental, it is claimed, materially lower than private owners could afford; that said incomes range as high as $1,700.00; that if said tenants fail to pay the established rents, they are ejected. It seems clear that the storerooms are being used for commercial enterprises in competition with private property similarly used; that the dwelling units are being used as private dwellings in competition with private property similarly used. In this connection it is immaterial whether the rents are low or high. Neither does the furnishing of a private dwelling for a family with a yearly income of $1,700.00 nor the ejection of a tenant who is unable to pay the rent seem compatible with the accepted definitions of charity. In **Humphries, Aud., et al., v the Little Sisters of the Poor, 29 Oh St 201, 207,** it is stated:

"In this case, two of the parcels were owned by the institution, and, as we understand the record, were actually occupied and used by it in connection with the parcel held by the lease on which the buildings used by the institution were situated. Under the statute, real estate is to be listed for taxation by the owner. This duty, as respects the leased premises in question, rested upon the lessors. The taxes were a charge against them and not against their lessee, and, as respects the public, it was their duty to see that the taxes were paid, without reference to their agreement with the lessee."

In that case the court held the two parcels belonging to the institution to be exempt but denied exemption as to the parcel that was leased to the institution, although the use by the institution was admittedly charitable as to the three parcels. In the instant case the United States Housing Authority is the owner and the lessor and the Cincinnati Metropolitan Housing Authority is the lessee and as such has paid rent to the lessor during the year in question in the fixed amount of $3,351.59 per month aside from other payments that were required by the lease involved. Under the principles laid down in Humphries, Aud., et v. The Little Sisters of the Poor, supra, even though the use by the lessee were charitable, the owner and lessor receiving rent therefor, said property would not be entitled to exemption. On consideration of the foregoing authorities, we find that said property is not used exclusively for charitable purposes.

Applicant's third claim is that "the state of Ohio, or its political subdivisions, cannot constitutionally tax any property owned by the United States of America."

The doctrine of implied immunity of the Federal Government and its instrumentalities from taxation by the states was first laid down in M'Culloch v Maryland, 4 Wheat. 316. That case was decided in 1819 and for many years thereafter the courts, apparently ignoring the limitations contained in the last paragraph of the opinion expanded the doctrine much farther than was warranted by the decision. The tendency in recent decisions, however, has been to limit the doctrine and bring it more in line with limitations contained in that case. Even in that case the great Chief Justice held that the real estate belonging to the bank (which was held to be a governmental instrumentality) was subject to state taxation. On p. 436 of the opinion, he states:

"This opinion does not deprive the states of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state. But

this is a tax on the operations of the bank, and is, consequently a tax on the operation of an instrument employed by the government of the Union to carry its powers into execution."

In Van Brocklin v Anderson, 117 U. S. 151, 29 L. Ed. 845 and United States v Alabama, 313 U. S. 274, 85 L. Ed. 1327, it was held that lands owned by the United States are not subject to state taxation. The Van Brocklin case, however, was a case in which the land was sold for the nonpayment of direct taxes imposed by an act of Congress and was purchased by the United States at this tax sale and later either redeemed or resold. The taxes involved in that case were imposed by the State of Tennessee during the period the United States held title to said lands. Apparently, the lands were not in any way used by the United States during the period it held the title and the only purpose in acquiring said lands was to enforce the payment of federal taxes. The collection of taxes is without question an essential governmental function. It follows that the United States in acquiring and holding title in that case was exercising an essential governmental function. However, the court in the opinion states, p. 847:

"The United States do not and cannot hold property, as a monarch may, for private or personal purposes. All the property and revenues of the United States must be held and applied, as all taxes, duties, imposts and exercises must be laid and collected, 'to pay the debts and provide for the common defense and general welfare of the United States'."

In the Alabama case the first paragraph of the syllabus states:

"Lands owned by the United States cannot be taxed by a state."

However, this question was not directly involved. The real issue decided therein was that a state statute creating an inchoate lien as of the tax day for taxes to be assessed during the year was not unconstitutional as against subsequent mortgagees and purchasers acquiring an interest in the land after the tax day but before the perfecting of the tax lien by final assessment. The court further held that the United States in acquiring title to said lands during this period took the same subject to the tax lien which became fixed prior to the purchase by the United States and that said lien remained a valid and existing lien even though it could not be enforced against the United States without its consent. While the final assessment of said taxes was made after the United States acquired title, the lien thereof became effective prior to the purchase by the United States. We do not feel that either of those cases apply to the issues involved herein.

Article I, Section 8 of the United States Constitution provides that Congress should have power to exercise exclusive jurisdiction over the seat of government of the United States, and "to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dock-yards and other needful buildings."

The Ohio Legislature granted its consent to the United States to acquire lands within this state by the enactment of §13770 GC, as follows:

"That the consent of the state of Ohio is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the constitution of the United States, to the acquisition by the United States, by purchase, condemnation, or otherwise, of any land in this state required for sites for custom houses, court houses, post offices, arsenals, or other public buildings whatever, or for any other purpose of the government."

In §13771 GC, it ceded to the United States exclusive jurisdiction over such lands for all purposes except the service of civil and criminal process of the courts of this state. In §13772 GC of the same act it provided that said lands while remaining the property of the United States:

"* * * shall be and continue exempt and exonerated from all state, county and municipal taxation, assessment or other charges which may be levied or imposed under the authority of this state; provided that nothing in this act contained shall be construed to prevent any officers, employees or inmates of any national asylum for disabled volunteer soldiers located on any such land over which jurisdiction is ceded herein, who are qualified voters of this state from exercising the right of suffrage at all township, county and state elections in any township in which such national asylum shall be located."

This land was acquired and the project constructed as a Federal Emergency Administration of Public Works Project under the provisions of 40 U.S.C.A. 421, et seq., which provides that the acquisition by the United States:

"* * * shall not be held to deprive any State or political subdivision thereof of its civil and criminal jurisdiction in and over such property, or to impair the civil rights under the local law of the tenants or inhabitants on such property; and in so far as any such jurisdiction has been taken away from any such State or subdivision, or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such State or subdivision."

Sections 422 and 423 provide for payment from operating receipts of such project of sums in lieu of taxes.

The consent of the state of Ohio granted by §13770 GC, to the United States to purchase lands within said state is confined to the provisions contained in Clause 17, Section 8, Article I of the Constitution of the United States and in the instant case must come within the phrase "and other needful buildings." Chief Justice Hughes in James v Dravo Contracting Company, 302 U. S. 134, 82 L. Ed. 155, 163, states:

"We construe the phrase 'other needful buildings' as embracing whatever structures are found to be necessary in the performance of the functions of the federal government."

Section 13770 GC, in granting consent to such acquisition by the United States confines the grant to land required for "purposes of government." It seems clear that unless this property is used by the Federal Government for governmental purposes, that §13771 does not cede jurisdiction over said lands to the United States and that exclusive jurisdiction over the same is not acquired by Clause 17 of Section 8, Article I of the Constitution of the United States.

In James v Dravo Contracting Company, supra, Chief Justice Hughes further states:

"* * * it is not unusual for the United States to own within a State lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State. The lands 'remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal'."

See also Mason v Tax Commission of Washington, 302 U S. 186, 82 L. Ed. 187. In Willcuts v Bunn, 282 U. S. 216, 75 L. Ed. 304, 307, Chief Justice Hughes states:

"The limitation of this principle to its appropriate applications is also important to the successful working of our governmental system. The power to tax is no less essential than the power to borrow money, and, in preserving the latter, it is not necessary to cripple the former by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and where no direct burden is laid upon the governmental instrumentality and there is only a remote, if any, influence upon the exercise of the functions of government."

In Ohio v Helvering, 292 U. S. 360, 78 L. Ed. 1307, Justice Sutherland states, p. 1309:

"* * * we pass at once to the fundamental question involved in the state's challenge to the validity of the tax. That challenge seeks to invoke a principle, resulting from our dual system of government, which frequently has been announced by this court and is now firmly established,—that 'the instrumentalities, means and operations whereby the States exert the governmental powers belonging to them are * * * exempt from taxation by the United States'. * * * But, by the very terms of the rule, the immunity of the states from federal taxation is limited to those agencies which are of a governmental character. Whenever a state engages in a business of a private nature it exercises nongovernmental functions, and the business, though conducted by the state, is not immune from the exercise of the power of taxation which the Constitution vests in the Congress. * * * If a state chooses to go into the business of buying and selling commodities, its right to do so may be conceded so far as the federal Constitution is concerned; but the exercise of the right is not the performance of a governmental function, and must find its support in some authority apart from the police power. When a state enters the market place seeking customers it divests itself of its quasi sovereignty pro tanto, and takes on the character of a trader, so far, at least, as the taxing power of the federal government is concerned."

In the Bank of the U. S. v The Planters' Bank of Georgia, 9 Wheat. 904, 906, 6 L. Ed. 244, Chief Justice Marshall states this proposition as follows:

"It is, we think, a sound principle, that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted."

In United States v Brown, 41 Fed. Supp. 838, it is stated in the third paragraph of the syllabus:

"That the United States owns all capital stock of regional agriculture credit corporations, and that such corporations are medium through which United States carries out certain proprietary activities, does not endow corporations with sovereign immunity from taxation."

In Union Pacific R. R. Co. v Peniston, 18 Wall 5, 21 L. Ed. 787, 792, it is stated:

"It may, therefore, be considered as settled that no constitutional implications prohibit a state tax upon the property of an agent of the government merely because it is the property of such an agent. A contrary doctrine would greatly embarrass the States in the collection of their necessary revenue without any corresponding advantage to the United States."

In Graves v New York, 306 U. S. 466, 83 L. Ed. 927, Justice Stone states (p. 933):

"* * * the only possible basis for implying a constitutional immunity from state income tax of the salary of an employee of the national government or of a governmental agency is that the economic burden of the tax is in some way passed on so as to impose a burden on the national government tantamount to an interference by one government with the other in the performace of its functions."

Referring to Helvering v Gerhardt, 304 U. S. 404, 82 L. Ed. 1427, Justice Stone further states:

"It was there pointed out that the implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted. For the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax, and where that immunity is invoked by the private citizen it tends to operate for his benefit at the expense of the taxing government and without corresponding benefit to the government in whose name the immunity is claimed. * * *
"* * * The burden on government of a non-discriminatory income tax applied to the salary of the employee of a government or its instrumentality is the same, whether a state or national government is concerned."

In the concurring opinion (Graves v New York) Justice Frankfurter states, p. 939:

"In view of the powerful pull of our decisions upon the courts charged with maintaining the constitutional equilibrium of the two other great English federalisms, the Canadian and the Australian courts were at first inclined to follow the earlier doctrines of this Court regarding intergovernmental immunity. Both the Supreme Court of Canada and the High Court of Australia on fuller consideration * * * have completely rejected the doctrine of intergovernmental immunity."

This case which was decided in 1939 aptly illustrates the present tendency of the courts to limit the doctrine of intergovernmental immunity in that it specifically overrules New York ex ˙Rogers v Graves, 299 U. S. 401, 81 L. Ed. 306, which was decided in 1937.

In Ohio v Helvering, supra, it was held that the sale of liquor by the State of Ohio was not the performance of a governmental function so far at least as to make it immune from federal taxation. In the instant case the property in question is being rented to private business to the highest bidder for ordinary commercial uses or to families for private residence purposes and in competition with privately owned similar property. Whatever difference there may be between the implied tax immunity of a state and the corresponding immunity of the national government and its instrumentalities, this distinction ceases when the Federal Government exceeds its delegated powers and engages in a private business. The leasing by the Federal Government of the property herein involved is not such an essential governmental function as to immunize said property from state taxation.

Applicant's fourth claim is that "the congress has the power to exempt from taxation property owned by an instrumentality of the Federal Government."

This question was raised but not decided in Graves v New York, 306 U. S. 466, 83 L. Ed. 927, 932, by Justice Stone who there states:

"Whether its power to grant tax exemptions as an incident to the exercise of powers specifically granted by the Constitution can ever, in any circumstances, extend beyond the constitutional immunity of federal agencies which courts have implied, is a question which need not now be determined."

In Pittman v H.O.L.C., 308 U. S. 21, 84 L. Ed. 11, the fourth paragraph of the syllabus states:

"It is within the constitutional authority of Congress to provide that a corporation created by it to facilitate the performance of its governmental functions, such as the Home Owners' Loan Corporation (including loans and mortgages made and held by such a corporation) shall be exempt from state and municipal taxation."

In that case the court held that mortgages of the Home Owners' Loan Corporation were immune from taxation by the state of Maryland under the provisions of the Home Owners' Loan Act, 12 U.S.C.A. 1463. The act provided:

"The Corporation, including its franchise, its capital. reserves and surplus, and its loans and income, shall likewise be exempt from such taxation; except that any real property of the Corporation

shall be subject to taxation to the same extent, according to its value, as other real property is taxed."

The provisions of this statute are merely declaratory of the immunity recognized by the courts. The exception from such immunity of the real estate was also made in M'Culloch v Maryland, supra. In Federal Land Bank v Crosland, 261 U. S. 374, 67 L. Ed. 703, it was held under a similar statute, 12 U.S.C.A. 931, that the state of Alabama could not tax mortgages of the Federal Land Bank. The statute in that case excepted the real estate from such immunity and in its other provisions was merely declaratory of the immunity recognized by the courts. The validity of such statute was not even questioned. It must not be overlooked that in the Pittman case the court held that Congress could exempt from state and municipal taxation instrumentalities of the government when they were engaged in "the performance of its **governmental** functions."

It may be conceded that any act of Congress that does not exceed the powers granted by the constitution is governmental action, Graves v New York, supra. The converse is equally true that any act of Congress that exceeds those powers is not a governmental action so far, at least, as the Federal Government is concerned and any instrumentality created thereby is not engaged in a governmental function. The question is justiciable and cannot be precluded by Congress without repudiating the entire theory of a grant of powers by the constitution of the United States.

In United States v Butler, 297 U. S. 1, 80 L. Ed. 477, Justice Roberts states:

"The question is not what power the federal Government ought to have but what powers in fact have been given by the people."

The eighth and twenty-first paragraphs of the syllabus are as follows:

"The Federal government is one of delegated powers; and has only such as are expressly conferred upon it and such as are reasonably to be implied from those granted."

"A widespread similarity of local conditions cannot confer upon Congress powers reserved to the states by the Federal Constitution."

In Carter v Carter Coal Company, 298 U. S. 238, 80 L. Ed. 1160, it is stated in the syllabus as follows:

"7. Beneficent aims, however great or well directed, can never serve in lieu of constitutional power.

"11. The power of the Federal government does not inherently extend to purposes affecting the nation as a whole with which the states severally cannot deal, or cannot adequately deal.

"12. Congress is without power to legislate substantially for the general welfare save as it may be promoted by the exercise of the powers which are granted."

In United States v Certain Lands in the City of Louisville, 78 Fed. (2d) 684, the seventh and eighth paragraphs of the syllabus are as follows:

"In the exercise of its police power, a state may do those things which benefit the health, morals, and welfare of its people, but the federal government has no such power within the states.

"The National Industrial Recovery Act, so far as it attempts to authorize national government to condemn private property for low-cost housing and slum-clearance projects and for purposes of reducing unemployment held unconstitutional, since such is not a 'public use'."

On p. 688 of the opinion, the court states:

"* * * The taking of one citizen's property for the purpose of improving it and selling or leasing it to another, or for the purpose of reducing unemployment, is not, in our opinion, within the scope of the powers of the federal government."

That case which affirmed the decision of the District Court reported in 9 F. Supp. 137 was decided October 9, 1935 by the United States Court of Appeals for the 6th Circuit. It was carried to the Supreme Court upon a Petition for Writ of Certiorari which was granted on October 28, 1935, 296 U. S. 567. On March 5, 1936, before the case was heard on its merits it was dismissed on motion of the Solicitor General, 297 U. S. 726. It seems logical that this dismissal was made because the Solicitor General felt that this decision was correct and would be affirmed by the Supreme Court, but regardless of the reasons therefor the fact remains that the Solicitor General by voluntary act permitted this decision to stand unquestioned as the highest authority within this jurisdiction. This is true regardless of a contra holding by the United States Court of Appeals for the 10th Circuit in Oklahoma City v Sanders, 94 Fed. (2d) 323.

The property involved herein was acquired by the United States as a slum-clearance and low-cost housing project of the Federal Emergency Administration of Public Works. If the purposes of this acquisition constitute an essential governmental function within the provisions of clause 17, Section 8, Article I of the Constitution of the United States and if said lands were to be used for the "purposes of government" within the meaning of §§13770 and 13771 GC, the state of Ohio has consented thereto and ceded jurisdiction to the United States by virtue of said sections in which event Section I of

387

the Slum-clearance and Low-cost Housing Act (40 U.S.C.A. 421) cedes back full civil and criminal jurisdiction to the state of Ohio. In October of 1937, by Executive Order No. 7732, this project was transferred to the United States Housing Authority under the provisions of the United States Housing Act of 1937 (42 U.S.C.A. 1404). Paragraph (e) of Section 1405 of said act purports to exempt such projects from taxation by a state or its subdivisions. It is claimed by the applicant that said section exempts this property from taxation. Even though the state of Ohio had consented to this purchase by virtue of §§13770 and 13771 GC, jurisdiction was ceded back by virtue of 40 U.S.C.A. 421 prior to the passage of the United States Housing Act of 1937. If said section is operative at all the status of said property became fixed and the United States Housing Act (42 U.S.C.A. 1404) could not, at least without again obtaining the consent of the state, impair the jurisdiction previously ceded to the state and it would, therefore, not be operative as to the lands herein involved.

On the other hand if the use of this property does not constitute a governmental function as was held in United States v Certain Lands in the City of Louisville, supra, the state of Ohio has not by the provisions of §13770 GC, consented to such acquisition and the United States never having acquired jurisdiction over said lands. Congress is without power to prohibit its taxation. We consider the legal principles set forth in the Louisville case to be sound and supported by the greater weight of the authorities and said decision stands unquestioned as the highest authority in this jurisdiction. Without determining whether the provisions of Section 5 of the United States Housing Act are applicable to the lands herein involved and upon authority of the Louisville case, we hold that in either event said lands are not used for an essential governmental function and are not immune from taxation by the state of Ohio.

THE BOARD OF TAX APPEALS.

FORD, member, dissents.